**PARAMONT MINING CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1237.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 8, 1980.
Decided Oct. 3, 1980.

Theodore J. Martineau, Philadelphia, Pa. (L. Jean Shannon, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Jack W. Burtch, Jr., Hunton & Williams, Richmond, Va., on brief), for petitioner.

James Y. Callear, N.L.R.B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Janet C. McCaa, N.L.R.B., Washington, D. C., on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and WIDENER and HALL, Circuit Judges.

WIDENER, Circuit Judge:

Paramont Mining Corporation seeks review of the NLRB's decision that the Company violated § 8(a)(3) and (1) of the NLRA by discharging employee William Collins.[1] The Board seeks enforcement of its order to reinstate Collins. We decline to enforce.

In January 1977, the United Mine Workers of America conducted an organizational drive among the Company's employees. Collins attended a union meeting on January 25th, during which the organizer asked those present to talk to anyone who had not signed a union card and try to get them to sign.

The next morning, Collins asked a fellow employee whether or not Terry Powers had signed a union card. (Powers was the only employee on the site who had not signed a union card.) Collins said, "If he didn't, after all us sticking our necks out the way we had, and didn't go with us and stay with us, we ought to run him off." Collins then approached a truck that Powers and some others were sitting in. According to Collins, he reached in through the window, shook or patted Power's head, and asked, "Have you signed that union card?" Powers replied, "No, I haven't. I'm not signing it; I'm not going to have anything to do with it." Collins asked Powers if he was that scared of Brown (the Company president). Powers said no, he just did not want to become involved with the union. Collins then said, according to him, "Now ain't that chicken–shit," and walked off. He was corroborated by one employee, while another corroborated Powers who testified Collins called Powers a "chicken–shit mother fucker" and told Powers that "if we go union and you don't sign this card, we'll black ball you and you'll lose your job." The Board did not decide which witnesses it credited, but that is a matter of indifference.

Powers related the incident to his foreman, who testified that Powers looked pale. Powers told him that he would not be able to work with Collins or anybody else that signed a card because he did not sign and that he would be better off on another jobsite, or he would quit.

The foreman took Powers to see Brown, whose office was five miles from that site. Powers vomited on the way to the office, and was still white, very shaky, and very nervous when he arrived. Powers told Brown that Collins was really rough on him, that he was afraid of Collins, afraid for his safety, and that he would quit before he worked under those conditions. Brown said he would get the matter straightened out, and since Powers would not return to the site Collins was at, Brown sent him to a different site.

1. The Board found that the Company violated the Act in other ways, including wrongfully discharging other employees. It ordered appropriate relief. The Company filed exceptions to the decision only insofar as it relates to Collins' discharge.

Later that morning, Brown went to the jobsite to speak with Collins about the incident.

As might be imagined, Brown and Collins had different versions of the conversation between them when Brown arrived at the jobsite. Collins' version is the more subdued, so the Board's best case is made from its relation of Brown's testimony:

Well, I didn't get in this business and didn't get where I am today by being susceptible to threats—there isn't anything you can say to me to make me change my mind—I know how a union takes care of things, I know how they sugar your equipment, abuse your equipment, blow it up on weekends and how they let out contracts on people like Yablonski and his family and have them wiped out. I'm not going to give in to that kind of threat, that's just the more reason, that's the kind of character that you are who is not even fit to be associated with the rest of the type of employees I keep. You are not going to be allowed on this job any more. Get your lunch bucket and get off the hill, and I don't ever want to see you on it again, and if I hear of Terry Powers getting any threatening phone calls or any repercussions to him or to any other employee on my payroll, I'm going to assume it was you and I am personally going to come after you and I play rough; I'll do whatever is necessary to get even with you and it will be your best benefit to be Terry Powers' bodyguard for the next 60 days. I don't care who it is, I'm going to hold you responsible.

The Board correctly found that "the activity of attempting to persuade Powers to sign a union card was concerted activity." It found further that Collins' "discharge was admittedly for conduct in the course of such activity which met with the respondents disapproval; *that of using rough language and intimidating a fellow employee.*" (Italics added.) Thus, it does not make any difference which version of the testimony concerning this incident the Board accepted (it has not formally credited one witness over another) for it came to the conclusion, which is inescapable from the record, that Collins' discharge was for using rough language and intimidating a fellow employee. The Board justified the language and the intimidation "because some timid soul among them [Powers] has a strong distaste and reaction to their union activities." It also reasoned that Collins did not threaten bodily harm or a breach of the peace.

■■ We recognize, of course, that an employer may not discharge union supporters in order to intimidate or coerce employees with respect to their self–organization and representation. *NLRB v. Fansteel Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939). However, the Act does not interfere with the employer's normal right to select and discharge employees, and "the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion." *Fansteel* at p. 254, 59 S.Ct. at p. 495. Likewise, union supporters are not at liberty to intimidate or coerce other employees. When employees resort to that kind of activity, they take a position outside the protection of the statute and accept the risk of discharge upon grounds aside from the exercise of the legal rights which the Act protects. *Fansteel*, 306 U.S. at 256–57, 59 S.Ct. at 496–97.

The primary objective of the Act is to secure the peaceful resolution of labor disputes. Section 7, 29 U.S.C. § 157, also provides that employees have the right to refrain from union activity. Section 10(c), 29 U.S.C. § 160(c), in some instances prohibits the Board from requiring the reinstatement of an employee discharged for cause, even if he is engaged in union activity and the cause for discharge arose from concerted activity. The legislative history of Section 10(c) makes this clear:

Undesirable concerted activities are not to have any protection under the act, and to the extent that the Board in the past has accorded protection to such activities, the conference agreement makes such protection no longer possible. Further-

more, in section 10(c) of the amended act, ... it is specifically provided that no order of the Board shall require the reinstatement of any individual or the payment to him of any back pay if such individual was suspended or discharged for cause, and this, of course, applies with equal force whether or not the acts constituting the cause for discharge were committed in connection with a concerted activity.

House Conference Rep. No. 510, 80th Cong., 1st Sess., 39 (1947), U.S.Code Cong.Serv. 1947, pp. 1135, 1145, reprinted in 1 NLRB *Legislative History of the Labor Management Relations Act,* 1947, at 543 (1948).

This court has repeatedly held that while strikers or union supporters are entitled to use arguments in support of their position and to attempt by proper means to induce others not to work or to sign union cards, "their persuasive efforts cannot be free of all restraints but must be circumscribed and confined within reasonable limits." *NLRB v. Pepsi Cola Co. of Lumberton, Inc.,* 496 F.2d 226, 228 (4th Cir. 1974), quoting *Oneita Knitting Mills, Inc. v. NLRB,* 375 F.2d 385, 390 (4th Cir. 1967). Recognizing that some confrontations between strikers and non-strikers, or between pro–union and anti–union employees, are inevitable, this court has drawn the line at least at conduct that is intended to threaten or intimidate. *NLRB v. Pepsi Cola,* 496 F.2d at 228; *NLRB v. Kelco Corp.,* 178 F.2d 578 (4th Cir. 1949). In *Pepsi Cola,* for example, a striker stuck his head in a job–seeker's car and told him one of three things, either "I know where you live at," or "I know where you live, and if you go in there to work, I'll come looking for you," or he said "He knew where we lived and he would be to see us." (Sic.) The court held it was unnecessary to determine which version was correct since "the implied threat is the same in all three versions." 496 F.2d at 228, n. 1. The *Pepsi Cola* court concluded: "We cannot agree that a veiled threat is substantially different from one delivered with less subtlety. Under any of the three versions, [his] words crossed the line from persuasion to threats and intimidation." Id. at 229.

We have also held that whether or not misconduct is sufficiently grave to deny reinstatement is a legal conclusion, and this court is free to accept or reject the Board's legal conclusions. *Oneita Knitting Mills,* 375 F.2d 385, 392 (4th Cir. 1967). The same rule applies to discharges. *Longview Furniture Co.,* at 276, infra.

In *NLRB v. Longview Furniture Co.,* 206 F.2d 274, 276 (4th Cir. 1953), we held that the "act does not protect them in using insulting and profane language calculated and intended to publicly humiliate and degrade employees who are attempting to work in an effort to prevent them from working," p. 276. We denied the reinstatement of employees who had been guilty of such acts because their conduct "cannot reasonably be said to be proper actions to 'effectuate the policies of this act' within the meaning of § 10(c), 29 U.S.C. § 160(c)." Id. at 276. In like vein, on facts quite similar to those in this case, in *NLRB v. Fibers International Corp.,* 439 F.2d 1311 (1st Cir. 1971), the court denied enforcement where a union advocate had chastised, cursed, and threatened a fellow employee who had denied that he signed a leaflet being circulated by the union. In the course of the argument, the advocate had placed his hands on the other employee, not hurting him, and blocked his way out of the parking lot. The other employee was frightened by the conduct of the advocate. The discharge of the advocate was held to be justified, and, as a part of its reasoning, the court stated: "Considering how seriously the Board regards company misconduct that might be designed to influence employees to reject the union, we may fairly expect the Board to take equally seriously employee misconduct aimed in the other direction. In any event, an employer has the right to do so." 439 F.2d at 1314.

■ In the case before us, Collins' misconduct not only was designed to, but in fact did, intimidate his fellow employee. His vulgar threats were entirely uncalled for. His uninvited shaking or patting the head of the fellow employee was a battery,

for "... the slightest touching of another ... if done in a rude, insolent, or angry manner, constitutes a battery for which the law affords redress." *Crosswhite v. Barnes*, 139 Va. 471, 124 S.E. 242, 244 (1924). See also *Jones v. Commonwealth*, 184 Va. 679, 36 S.E.2d 571, 572 (1946). See Va. Code § 18.2–57 for the criminal penalty. We think that Brown was fully justified in his discharge of Collins and that, on account of that incident, the Board's finding, that the company was guilty of violations of §§ 8(a)(1) and 8(a)(3), is not supported by substantial evidence. Further, we think its necessary conclusion that, because Collins was engaged in concerted activity, his cursing, intimidation, and battery of a fellow employee were justified, is incorrect. Activities such as those of Collins are not protected by the statute.

*ENFORCEMENT DENIED.*