**NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent**

and

**United Steelworkers of America, AFL–CIO, CLC, Intervenor.**

No. 82–2126.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1984.

Decided June 28, 1984.

Willis L. Goldsmith, Washington, D.C. (Andrew M. Kramer, Jones, Day, Reavis & Pogue; Lee E. Miller, Joseph R. Damato, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., on brief), for Newport News Shipbuilding and Dry Dock Co.

Jonathan Saperstein, Washington, D.C. (John G. Elligers, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief), for N.L.R.B.

Paul Whitehead, Lynchburg, Va. (Robert S. Bates, Jr., Bernard Kleiman, Chicago, Ill., on brief), for United Steelworkers of America, AFL–CIO–CLC.

Before WIDENER and ERVIN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

ERVIN, Circuit Judge:

In January 1979, the United Steelworkers Local Union 8888 called for a general strike at the Newport News Shipbuilding and Dry Dock Company (the Company) because of the Company's refusal to bargain following an election won by the Union. After the strike ended, the Company discharged 27 of its employees for strike misconduct. The discharged employees sought reinstatement through their union under the National Labor Relations Act (the Act).[1] Lengthy hearings were held before an Administrative Law Judge. At the end of the hearings, the ALJ ordered the Company to reinstate 21 of the 27 employees. The National Labor Relations Board affirmed the ALJ's decision and adopted his opinion. The Company and the Union then petitioned for review of the

---

1. 29 U.S.C. § 151 *et seq.*

Board's order—the former claiming all employees should remain discharged, the latter arguing all should be reinstated. We now consider the petition for review and cross petition for enforcement of the Board's order to reinstate Wayne N. Fisers, Frances Price, Brad W. Harrison, Stanley Holmes, Andrew Lewis and Jeffry R. Trussell.[2] We grant enforcement of the orders to reinstate Fisers and Price and we deny enforcement as to Harrison, Holmes, Lewis and Trussell.

### I.

On October 27, 1978, the Board certified the United Steelworkers of America, AFL–CIO–CLC, as the exclusive collective bargaining representative of the Company's 19,000 production and maintenance employees. The Board later found that on November 2, 1978, the Company had violated § 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union. *Newport News Shipbuilding & Dry Dock Co.*, 243 N.L.R.B. 99 (1979), *enforced*, 608 F.2d 108 (4th Cir.1979). The Company's refusal to bargain apparently engendered great resentment among Union employees.[3] On December 10, 1978, approximately 7,000 union members met at the Hampton Coliseum to decide how to respond to the Company's refusal to bargain. According to the Union newspaper, the question posed to the membership was "whether to wait while

the charges filed against the company go through the judicial system, or to take action on their own to enforce the law by authorizing a strike." (J.A.168) The majority of assembled employees voted to authorize a strike when the Union officers and negotiating team "deemed it necessary." In mid-January, the Union's negotiating team decided to respond to the Company's continued refusal to bargain by calling for a general strike. On January 31, over 13,000 company employees walked out.

The strike lasted until April 23 and was marked by numerous reports of alleged misconduct by strikers against non-strikers. Strikers had allegedly assaulted employees attempting to cross the picket line, damaged non-strikers' cars, and made verbal threats against non-strikers. The most common disorder reported was the spreading of nails and tacks at entrances to company premises to cause flat tires. During the strike, the Company repaired numerous tires flattened by sharply pointed objects. The Company discharged strikers for strike misconduct on the basis of state district court convictions.[4] Strikers convicted of offenses involving the intimidation or harassment of employees reporting to work were initially suspended. If the offenses for which they were convicted was corroborated by Company investigations, the em-

---

**2.** On the eve of oral argument, the Union withdrew its attack on the NLRB's refusal to reinstate six employees, and the Company withdrew its challenge to ten of the employees ordered reinstated. Following oral argument, the Company withdrew its challenge to five additional employees leaving six individual cases for review.

On June 6, 1984, we granted the Board's uncontested motion to dismiss the petition for review in No. 83–1199 and for summary enforcement in No. 82–2126 as to the unopposed portions of the Board's order. However, as to the still opposed portions of the Board's order in No. 82–2126, we denied the Board's motion to remand.

**3.** Because the Board's decision to certify the Union was not directly reviewable, *AFL v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940), the Board's determination that the Union had won a valid election could not be tested

in a court of appeals unless the Company refused to bargain. Nevertheless, the Company's refusal to bargain was an unfair labor practice; thus, the resulting strike was technically an unfair labor practice strike. As the Union notes in its brief, it had faced a number of unfair labor practices committed by the Company in past years. *See, e.g., Newport News Shipbuilding & Dry Dock Co.*, 236 N.L.R.B. 1637 (1978), *enforced* 602 F.2d 73 (4th Cir.1979). It is this history that might account for the Union's unusually strident reaction to the Company's refusal to bargain in this case.

**4.** Many of the convictions were subsequently overturned in the Virginia circuit court. Although state district court convictions are not relevant to our review of whether an individual actually engaged in strike misconduct, they are probative of the Company's "honest belief" that an individual had committed acts which justified suspension or discharge.

ployee was discharged. Following this procedure, the Company discharged a total of 27 employees.

In reviewing the Company's actions, the Administrative Law Judge examined the reports relied on by the Company and heard testimony from observers and participants. Relying on *Coronet Casuals, Inc.*, 207 N.L.R.B. 304, 305 (1974), the ALJ reasoned that reinstatement should be granted to strikers who only engaged in minor, non-violent incidents of misconduct.[5] He concluded that 21 of the 27 discharged strikers should be reinstated.

## II.

■■■ An employer who refuses or delays the reinstatement of strikers who have engaged in a protected strike violates § 8(a)(3) and (1) of the Act unless he can show "legitimate and substantial business justifications" for his actions. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (quoting *NLRB v. Great Dane Trailers*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967)). A showing that an employee engaged in serious strike misconduct constitutes such justification. Serious strike misconduct, however, is not self-defining. "Recognizing that some confrontations between strikers and nonstrikers are inevitable, we have drawn the line at conduct that is intended to threaten or intimidate nonstrikers." *NLRB v. Pepsi-Cola Co. of Lumberton*, 496 F.2d 226, 228 (4th Cir. 1974). *Accord Paramont Mining Corp. v. NLRB*, 631 F.2d 346, 349 (4th Cir.1980). This standard necessarily excludes from the definition of serious strike misconduct

behavior which may be abusive and uncalled for but which does not reasonably tend to coerce or intimidate.[6] The "holdings of this court preclude the unfair labor practice employer from pointing to trivial incidents and the use of obscene and insulting language, spontaneously and in isolated instances, as justification for a refusal to offer reinstatement at the termination of the strike." *Oneita Knitting Mills v. NLRB*, 375 F.2d 385, 390 (4th Cir.1967).

The Board's decision on whether or not strike misconduct is serious enough to deny reinstatement is a legal conclusion that we, of course, are free to accept or reject. *Paramount Mining v. NLRB*, 631 F.2d at 349; *Oneita Knitting Mills v. NLRB*, 375 F.2d at 392. The Board's underlying findings of fact, however, must be accepted if supported by substantial evidence. 29 U.S.C. § 160(e). Due regard must be given to the opportunity of the ALJ to assess the credibility of the witnesses and to the Board's experience in the practical world of industrial life. As the Supreme Court has said,

> we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life ... and of '[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases' from its special understanding of 'the actualities of industrial relations.' "

*NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963) (citations omitted) (quoting *NLRB v. Steelworkers*, 357 U.S. 357, 362–

---

5. That part of *Coronet Casuals* holding that words alone, short of an immediate threat of physical harm, unaccompanied by physical threats, could never constitute misconduct serious enough to justify discharge, has recently been overruled by the Board in *Clear Pine Mouldings, Inc.*, 268 N.L.R.B. No. 173 (Feb. 22, 1984).

6. The First and Third Circuits as well as the Board have adopted an objective formulation to determine when strike misconduct is serious. Misconduct is deemed serious if it "may reasonably tend to coerce or intimidate employees."

*NLRB v. W.C. McQuaide, Inc.*, 552 F.2d 519, 528 (3d Cir.1977). *Accord Associated Grocers of New England v. NLRB*, 562 F.2d 1333 (1st Cir. 1977); *Clear Pine Mouldings, Inc.*, 268 N.L.R.B. No. 173 (1984). We consider the question of whether a striker's misconduct reasonably tends to coerce or intimidate to be part of an objective inquiry to determine the striker's intent. Thus, we find the standard employed by the First and Third Circuits and recently adopted by the Board to be in harmony with the standard for determining strike misconduct long employed by this court.

363, 78 S.Ct. 1268, 1271–1272, 2 L.Ed.2d 1383 (1958)).

## WAYNE N. FISERS

■ Wayne Fisers joined the strike at its inception and picketed the shipyard for three to four weeks. In mid-March, he abandoned the strike and returned to work. After the Union ended the strike, the Company notified Fisers that effective April 23 he was terminated because of his alleged strike misconduct. On the morning of February 6, Fisers wore a sheathed hunting knife on his belt as he picketed the shipyard. Later that morning, Fisers put on his coat which apparently covered the knife. Two Newport News police officers then approached Fisers to question him about the hunting knife, and when Fisers showed it to them, the officers arrested him for carrying a concealed weapon. Although accounts of the knife's size varied, Fisers's testimony provides substantial evidence supporting the ALJ's conclusion that "[t]he hunting knife consisted of a blade approximately 4 inches in length and a handle approximately 3 inches in length." (J.A. 183) Fisers testified that it was not uncommon for Company employees to wear sheathed knives to work and that he had seen other pickets dressed in this fashion. The ALJ concluded that the "presence of a sheathed knife on Fisers's belt, as he walked the picket line, was not likely to cause fear among nonstrikers...." (Id.)

We agree that the mere possession of a small knife unaccompanied by circumstances indicating a threat of force does not reasonably tend to threaten or intimidate nonstrikers. This is not a case in which the employee brandished his weapon or made any gestures drawing attention to it. Cf. Advance Industries Division—Overhead Door Corp. v. NLRB, 540 F.2d 878 (7th Cir.1976) (reinstatement denied to striker who drew a handgun, crouched, and pointed it at company property while in the picketing area); Clear Pine Mouldings, Inc., 268 N.L.R.B. No. 173 (1984) (reinstatement denied to striker who wielded a two foot club when "circumstances clearly indicate that violence or instilling a fear of

bodily harm was the reasonably intended use of the club ...."). It is reasonable to infer that employees at the shipyard were accustomed to seeing sheathed knives on fellow employees and that Fisers's mode of dress, unaccompanied as it was by threatening gestures, did not reasonably tend to coerce nonstriking employees. Accordingly, we grant enforcement of the Board's order reinstating Fisers with back pay.

## FRANCES PRICE

On February 1, 1979, Frances Price and a fellow striker approached a picket line at the Company's 68th Street gate intending to enlist as pickets. As they approached the gate, they saw nonstrikers driving out and heard pickets and occupants of the departing automobiles yelling at one another. Price walked across the lane leading out of the gate, thus causing a departing station wagon to slow down. She approached the side of the car and rapped her first against the driver's window and against the rear window. After she rapped on the window of a second car exiting the shipyard and yelled "scab," a Newport News police officer removed her from the picket area, took her to a nearby patrol car, and turned her over to a police officer in the car. The officer attempted to handcuff her, and a scuffle ensued in which Price bit and kicked the officer. With the aid of fellow policemen, the officer was able to take Price to a police paddy wagon where she calmed down.

■ The ALJ concluded that Price's misconduct was not sufficiently serious to justify her suspension or discharge. As the ALJ noted, Price did not threaten non-strikers with injury or damage, and her rapping in fact caused no damage. Furthermore, she did not attempt to stop the cars from leaving. Cf. Hedstrom Co. 235 N.L.R.B. 1198 (1978), enforced, 629 F.2d 305 (3rd Cir.1980) cert. denied 402 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981) (reinstatement denied where striker physically prevented car from passing and threatened physically to harm occupants). Rather,

Price seemed only to be expressing a spontaneous burst of anger. As one officer noted, "the atmosphere was very high spirited" on the picket line that day. In this setting, Price's spontaneous acts of window slapping and name calling could not reasonably tend to coerce nonstriking employees. *See Oneita Knitting Mills v. NLRB*, 375 F.2d at 390; *Advance Industries Division—Overhead Door Corp. v. NLRB*, 540 F.2d at 882.

■ Price's misconduct with the police is more serious, but it took place off the picket line. The ALJ concluded that the police altercation did not constitute serious misconduct because Price's "scuffles with the police were of brief duration, caused no serious injury, and did not lead to disorders by her fellow strikers." (J.A. 222) Price's conduct cannot be condoned, and criminal charges were properly lodged against her. However, her heated but brief police resistance does not render her unfit for future employment unless it was part of an effort to coerce nonstriking employees. When Price was initially apprehended, she offered no resistence and peaceably left the picket line. Only after she was brought to the patrol car outside the picket area (albeit within view of fellow pickets) did her irascibleness flare up anew. Even at this time, however, she made no threats against nonstrikers. We cannot say that Price's spontaneous eruption of anger at the arresting officers after she was taken from the picket line was intended to coerce nonstrikers or could reasonably have had such an effect.

Accordingly, we grant enforcement of the Board's order to reinstate Price with back pay.

### BRAD K. HARRISON

On February 4, 1979, Brad Harrison was on the picket line at the 37th Street entrance to the shipyard. During the evening, Newport News Police Officer David Dorner saw Harrison place a flathead roofing nail on the driveway leading into the shipyard. The ALJ found that "Harrison dropped only one roofing nail at the 37th

Street gate at a time when there was a quantity of other nails on the same ground." (J.A. 189) He thereafter concluded "that Harrison's misconduct was not so egregious as to warrant his discharge." (J.A. 190)

■ It is not the egregiousness of the conduct that matters, however, but whether conduct is intended to threaten or intimidate nonstrikers. *See NLRB v. Pepsi Cola Co. of Lumberton*, 496 F.2d at 228. In measuring conduct by this standard we must look at the context in which the conduct took place. Throughout this strike, flat tires caused by sharp objects such as roofing nails created a serious and ubiquitous problem for nonstriking employees reporting to work. In light of the prevalence of this tactic, Harrison's placement of a roofing nail at the entrance to the shipyard cannot reasonably be viewed in isolation. Rather, it must be seen as part of a premeditated effort to intimidate strike breakers. As such, Harrison's conduct was not protected by the Act. Therefore, we deny enforcement of the Board's order to reinstate Harrison with back pay.

### STANLEY HOLMES

■ On April 10, Stanley Holmes was working the picket line at the 50th Street gate. As a nonstriking employee attempted to cross the picket line, Holmes blocked the employee's path and called him a "m——f——." The employee attempted to avoid Holmes by walking around him, but Holmes again moved in front of the employee and would not let him pass. Only the prompt intervention of a Newport News police officer cleared a path for the nonstriker and allowed him to enter the shipyard. Thereafter the officer charged Holmes with a violation of Virginia's right to work law. The ALJ concluded that Holmes' conduct was not so serious as to justify discharge. We disagree.

Although briefly blocking a shipyard entrance may be considered only minor misconduct, Holmes never voluntarily allowed the nonstriker to pass. But for the inter-

vention of police, the nonstriker was faced with the choice of either turning back or fighting on. By placing the nonstriker in this dilemma, Holmes clearly exhibited an intent to intimidate or coerce. The prompt reaction of a nearby police officer does not negate this intent. We thus decline to enforce the Board's order to reinstate Holmes with back pay.

### JEFFREY TRUSSELL

On April 16, Jeffrey Trussell was among a crowd of pickets that walked up to the shipyard's 50th Street gate. Chanting "we shall not be moved," Trussell and the other pickets stood shoulder to shoulder and interlocked arms. Several nonstriking employees attempted to enter the shipyard but were turned back by this human wall. Approximately five minutes after forming the blockade, Trussell was arrested by a Newport News police officer who broke up the crowd of pickets. The memorandum on which the Company relied in discharging Trussell stated that he had been convicted of violating Virginia's right to work law because he along with other pickets blocked the path of nonstriking employees attempting to enter the shipyard. It failed to disclose how long Trussell actually blocked the gate. The ALJ concluded that "this gap deprived both [the Company's] decision to terminate and the earlier decision to suspend Trussell of the necessary factual support for an honest belief that this employee's misconduct ... was serious enough to warrant such actions." (J.A. 205–206) Therefore, he ordered Trussell reinstated.

■ The argument that the initial memorandum was insufficient to support a finding of serious misconduct implies that in deciding whether the discharge violated the Act we should limit our inquiry to the evidence set forth in the memorandum. We disagree. The Company must have an honest belief that an employee engaged in serious misconduct before suspending or discharging that employee. *Giddings & Lewis Inc.*, 240 N.L.R.B. 441, 447–48 (1979). A district court conviction for viola-

tion of Virginia's right to work law is evidence of this honest belief. Once evidence of the Company's good faith is presented, however, we will not blind ourselves to evidence of misconduct not mentioned in the original memorandum relied on by the Company. All the evidence presented before the ALJ may then be considered in determining whether the Company's actions violate the Act.

■ In this case, testimony indicated that Trussell actively blocked the gate for about five minutes before police intervened. The ALJ concluded that this blockage was of "too short a period to warrant the suspension or the termination imposed upon Trussell." (J.A. 206 n. 30) We, however, view Trussell's conduct as similar to that of Holmes. By intentionally preventing nonstrikers from going into the shipyard, Trussell engaged in intentionally coercive activity. The short duration of Trussell's conduct would mitigate the seriousness of his misconduct if he had voluntarily ceased blocking the gate, but this was not the case. It took police intervention to clear the way. Therefore, we deny enforcement of the Board's order to reinstate Trussell with back pay.

### ANDREW LEWIS

■ On February 19, Andrew Lewis was walking the picket line at the Company's 46th Street gate. As a nonstriking employee walked out of the gate at approximately 4:15 P.M., Lewis stepped out of the picket line and yelled at the nonstriker: "Hey scab, yeah you, I'm gonna screw your wife, sure you get an early start in the morning, I want to have plenty of time to take care of your home life." (J.A. 195) On hearing the statement, the nonstriking employee "stopped in his tracks and turned around" with balled up fists. (J.A. 1117) He stood glaring at Lewis for a few seconds until a Newport News police officer intervened and motioned for him to move on. But for this intervention, the two would likely have come to blows. The ALJ found "that Andrew Lewis's misconduct ... was not so serious as to warrant termination ... it was some of the banter to be

expected between strikers and nonstrikers at or near the picket line." [7] (J.A. 196)

We disagree. Lewis's conduct went beyond the use of obscene and insulting language to a real threat of future harm. As such, it could only have been intended to intimidate. The seriousness of Lewis's threat is reflected in the reaction it provoked. We could expect a harmless threat to be shrugged off, but the nonstriker's angry reaction clearly revealed the threat's force. Lewis's intimidating misconduct removes him from the Act's protection. Consequently, we deny enforcement of the Board's order to reinstate Lewis with back pay.

### III.

For the foregoing reasons, the Board's order to reinstate Wayne N. Fisers and Frances Price is hereby enforced, and we deny enforcement of the Board's order to reinstate Brad W. Harrison, Stanley Holmes, Jeffrey R. Trussell, and Andrew Lewis.

**ENFORCEMENT GRANTED IN PART AND DENIED IN PART.**

---

7. The ALJ also found that the Company did not have an honest belief that Lewis engaged in serious misconduct because the memorandum on which it based his discharge only mentioned that he was convicted of violating Virginia's right to work law for threatening to sleep with a nonstriker's wife. For reasons previously related, we find that the memorandum was adequate to establish the Company's good faith; therefore, we proceed to consider all the evidence before the ALJ.