United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 16, 1998 Decided June 12, 1998

 No. 97-1365

 National Conference of Firemen and Oilers, 

 SEIU, AFL-CIO, 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 Cook Family Foods, Inc., 

 Intervenor

 Consolidated with 

 No. 97-1376

 On Petitions for Review and Cross-Application 

 for Enforcement of an Order of the 

 National Labor Relations Board

----------


 Erick J. Genser argued the cause and filed the briefs for 
petitioner National Conference of Firemen and Oilers, SEIU, 
AFL-CIO.

 William M. Muth, Jr., argued the cause for petitioner 
Cook Family Foods, Inc., with whom Kelvin C. Berens was on 
the briefs.

 Rachel I. Gartner, Attorney, National Labor Relations 
Board, argued the cause for respondent, with whom Linda 
Sher, Associate General Counsel, Aileen A. Armstrong, Depu-
ty Associate General Counsel, and David S. Habenstreit, 
Supervisory Attorney, were on the brief.

 Kelvin C. Berens and William M. Muth, Jr., were on the 
brief for intervenor Cook Family Foods, Inc.

 Before: Edwards, Chief Judge, Henderson and Rogers, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: Cook Family Foods, Inc. ("Cook"), 
and the National Conference of Firemen & Oilers, SEIU, 
AFL-CIO ("the union"), petition for review of a decision and 
order of the National Labor Relations Board ("the Board"). 
Cook fired nine strikers for damaging cars entering and 
leaving a plant that they were picketing. An administrative 
law judge ordered reinstatement for the discharged strikers 
on the ground that their misconduct was not as serious as the 
misconduct of two supervisors who displayed and sighted a 
rifle in the plant parking lot in view of picketers located 
roughly 140 yards away. The Board reversed that order, 
although it agreed that the supervisors' actions with the 
firearm violated the National Labor Relations Act ("the Act"). 
Because we conclude that the Board's determinations that the 
supervisors engaged in an unfair labor practice and that the 
company did not unfairly discriminate against the terminated 
strikers were reasonable and supported by substantial evi-
dence, we deny the petitions.


 I.

 A hotly contested strike at Cook's meat processing facility 
in Grayson, Kentucky, lasted from November 1993 to April 
1995 and was marked by continuous picketing of the facility 
and numerous acts of violence. After establishing that it 
would not discharge any employee accused of strike-related 
misconduct unless the employee admitted the misconduct or 
there was "indisputable" evidence thereof, Cook discharged 
nine striking employees but no nonstriking employees under 
this standard. See Cook Family Foods, Inc., 323 N.L.R.B. 
No. 62, at 1 (1997). Three of the fired strikers set up or 
threw nails on the road leading to the Cook's facility, one 
placed caltrops (devices with four spikes positioned such that 
one always projects upward) in front of vehicles entering the 
plant, and another did the same with both nails and caltrops. 
Two others not only placed nails on the road leading to the 
facility, but also kicked a vehicle. Another slashed the tires 
on a nonstriking employee's vehicle, and still another attempt-
ed to run a car occupied by three nonstriking employees off 
the road. See id. at 1, 3-5.

 During the strike, two nonstriking company supervisors 
examined a firearm that another employee had for sale in the 
plant parking lot. See id. at 7. The administrative law judge 
found that:

 The two supervisors went to a vehicle which was located 
 approximately 140 yards northeast of the picket line 
 manned by four strikers and 155 yards southeast of the 
 trailer used by the Union as its strike headquarters. 
 [The supervisors] removed a high-powered rifle with a 
 telescopic sight from the car. Each of the men examined 
 the rifle and sighted it on a target to the northeast of 
 their position, but both denied pointing the rifle at the 
 pickets or trailer.

Id. (footnotes omitted). The strikers saw the supervisors 
with the rifle and called the police. Cook investigated the 
incident and issued written warnings to both supervisors "for 
using poor judgment in displaying a gun in front of pickets," 
but did not take further disciplinary action.


 The union filed charges against Cook for its firing of the 
nine strikers, and the Board's Acting Regional Director sub-
sequently issued a complaint arguing that Cook should not 
have discharged the strikers for strike-related misconduct 
without also discharging the two supervisors. Under the 
Board's precedents, an employer "may not knowingly tolerate 
behavior by nonstrikers or replacements that is at least as 
serious as, or more serious than, conduct of strikers that the 
employer is relying on to deny reinstatement to jobs." Aztec 
Bus Lines, Inc., 289 N.L.R.B. 1021, 1027 (1988). The admin-
istrative law judge agreed that Cook's decision to terminate 
the strikers without terminating the supervisors was discrimi-
natory. The judge explained that the misconduct of the 
supervisors had violated the organizational rights of workers 
protected by the National Labor Relations Act:

 The two supervisors' admitted possession and brandish-
 ing of a high-powered rifle took place (1) without a 
 defensive motive, (2) during an already violent strike, (3) 
 in close proximity to the picket line, (4) in broad daylight, 
 and (5) within the view of peacefully picketing employees 
 who reported the event to the police. Under these 
 circumstances, I conclude that the conduct of [the super-
 visors] "may reasonably tend to coerce or intimidate 
 employees in exercise of rights protected by the 
 Act"....

Cook Family Foods, 323 N.L.R.B. No. 62, at 7 (quoting Clear 
Pine Mouldings, Inc., 268 N.L.R.B. 1044, 1046 (1984)). The 
administrative law judge also concluded that because the 
supervisors had displayed a firearm that carried with it "the 
implicit threat of the use of deadly force," and because "the 
threat of physical harm is by its nature more serious than a 
threat to property," the supervisors' misconduct was more 
severe than the actions of the terminated strikers, who had 
simply sought to damage automobiles leaving and entering 
the plant. Cook Family Foods, 323 N.L.R.B. No. 62, at 7 
(quoting Gibson Greetings, Inc., 310 N.L.R.B. 1286, 1313 
(1993), and Chesapeake Plywood, Inc., 294 N.L.R.B. 201, 205 
(1989)) (internal quotation marks omitted). Thus, the judge 


ordered that seven of the discharged strikers be offered 
reinstatement and compensation for wages lost and that one 
other be compensated for backpay. See id. at 7-8.1

 Upon Cook's appeal, the Board affirmed in part and re-
versed in part. First, the Board agreed with the administra-
tive law judge that the supervisors' "examining of the rifle 
within the sight of the pickets" was an unfair labor practice 
under the Act. Id. at 2 n.5. Accordingly, the Board ordered 
Cook to cease and desist from "[c]oercively displaying fire-
arms to peacefully picketing employees" or "[i]n any like 
manner interfering with, restraining, or coercing employees 
in the exercise of rights guaranteed them by Section 7 of the 
Act." Id. at 8; see id. at 2. In addition, the Board ordered 
Cook to post a notice to employees informing them of their 
rights under the Act and affirming that Cook "will not 
coercively display firearms to peaceful picketing employees" 
or in any similar way interfere with the employees' rights 
under the Act. Id. at 2-3. However, the Board reversed the 
administrative law judge's conclusion that Cook's failure to 
discharge the two supervisors was discriminatory. Applying 
the Aztec Bus Lines test, the Board declined to find that the 
supervisors' "errant actions, undertaken solely for the pur-
pose of examining a rifle that was for sale, were of equal or 
greater severity than the strikers' misconduct, which was 
intended to cause property damage." Id. at 2. Thus, the 
Board refused to find that the failure to discharge the super-
visors was discriminatory and concluded that Cook's dis-
charge of the strikers did not violate the Act.

 II.

 Cook contends that the Board erred in concluding that the 
supervisors' conduct violated section 8(a)(1) of the Act, which 
provides that "[i]t shall be an unfair labor practice for an 

__________
 1 The administrative law judge did not order any remedy for 
the striker who had attempted to run three nonstriking employees 
off the road, concluding that this misconduct was more serious than 
that of the supervisors. See Cook Family Foods, 323 N.L.R.B. No. 
62, at 7.


employer ... to interfere with, restrain, or coerce employees 
in the exercise of the rights" guaranteed under section 7 of 
the Act. 29 U.S.C. s 158(a)(1) (1994); see also id. s 157. 
The union, in turn, challenges the Board's decision upholding 
Cook's termination of the nine strikers without similar disci-
pline of the two supervisors.

 The court reviews the Board's factual findings to determine 
whether they were supported by substantial evidence and its 
legal conclusions for reasonableness. "[T]he findings of the 
Board with respect to questions of fact if supported by 
substantial evidence on the record considered as a whole shall 
... be conclusive." Id. s 160(f). We will uphold the Board's 
legal conclusions unless it acted arbitrarily or otherwise erred 
in applying established law to the facts. See General Elec. 
Co. v. NLRB, 117 F.3d 627, 630 (D.C. Cir. 1997).

 A.

 As to the supervisors, Cook maintains that the Board failed 
adequately to consider the gun-carrying climate surrounding 
the Grayson facility when it determined that the supervisors' 
examination of the hunting rifle constituted an unfair labor 
practice pursuant to section 8(a)(1) of the Act. Cook present-
ed evidence that Kentucky permits its residents to carry 
concealed weapons, that half of the men who lived in and 
around Grayson carried firearms in their vehicles, and that 
some employees in the plant carried weapons in their vehi-
cles. Therefore, Cook maintains, the Board's decision that 
the supervisors committed an unfair labor practice when they 
displayed a hunting rifle in the plant parking lot was irration-
al.

 The Board has previously concluded that the display of a 
gun to strikers tends to interfere with their right to organize 
collectively. Thus a supervisor who "held up a holstered 
handgun for [a worker] to see" in the course of an argument 
with a picketing worker interfered with that worker's rights 
under the Act. Ford Bros., Inc., 294 N.L.R.B. 107, 107 
(1989). Similarly, a company president who carried a loaded 
gun across a picket line also violated the workplace rights of 


the picketers. See Highland Plastics, Inc., 256 N.L.R.B. 146, 
160-61 (1981). As the Board has explained, "a gun is an 
inherently dangerous weapon." Keco Indus., Inc., 301 
N.L.R.B. 303, 303 (1991). The supervisors did not display the 
rifle defensively in response to threatening conduct by strik-
ers; the picketers were nowhere near the supervisors when 
they examined and sighted the gun. Cf. Cabot Corp., 223 
N.L.R.B. 1388, 1390-91 (1976). The Board's conclusion that 
the display and sighting of a hunting rifle in the plant parking 
lot in front of the picketers did not represent a departure 
from these precedents. Although the Board indicated for the 
first time that a gun may be brandished some distance away 
from a picketing worker--here, 140 yards away--and still 
interfere with the organizational rights protected by the Act, 
that conclusion follows logically from prior precedents.

 Of course, as Cook observes, the mere presence of a 
dangerous weapon in the workplace, without more, would not 
necessarily constitute a violation of the Act, especially in a 
locale where weapons possession is as accepted and common 
as it is in Grayson. In Newport News Shipbuilding & Dry 
Dock Co. v. NLRB, 738 F.2d 1404 (4th Cir. 1984), for exam-
ple, the Fourth Circuit agreed with the Board that a striker's 
"mere possession of a small knife unaccompanied by circum-
stances indicating a threat of force does not reasonably tend 
to threaten or intimidate nonstrikers." Id. at 1409. Yet 
while not every display of a dangerous weapon triggers the 
strictures of the National Labor Relations Act, the Board's 
determination that the supervisors' actions constituted an 
unfair labor practice was consistent with its precedents and 
reasonable under the circumstances. Cook contends that the 
supervisors' examination of the gun is indistinguishable from 
the striker's possession of a knife in Newport News, but we 
disagree. Newport News was "not a case in which the 
employee brandished his weapon or made any gestures to 
drawing attention to it," id. at 1409; by contrast, Cook's 
supervisors drew attention to their gun by displaying it in 
front of the picketers and targeting it using a telescopic sight. 
Furthermore, the Board's decision that the scoped rifle, as 
opposed to a small knife, would tend to instill fear in the 


assembled picketers under the circumstances was consistent 
with both its own findings and the Supreme Court's observa-
tion that "the display of a gun instills fear in the average 
citizen." McLaughlin v. United States, 476 U.S. 16, 17-18 
(1986); see also Keco Indus., 301 N.L.R.B. at 303. Indeed, 
the fact that the picketers who saw the rifle immediately 
called the police supports the Board's conclusion that the 
display of the rifle tended to intimidate the employees in the 
exercise of their workplace rights. The strikers' appeal to 
the police also lessens the credibility of Cook's argument that 
weapons possession was so common in Grayson that, even in 
the context of a contentious, violent strike, the supervisors' 
display of a high-powered rifle with a telescopic sight near 
picketers was not an unreasonably coercive action. More-
over, even if the supervisors' activity was legal under Ken-
tucky law, state gun laws do not determine whether actions 
that are legal under those laws also violate the Act. As the 
Board has explained, "[t]he legality of ... conduct under 
state laws is not dispositive of what are separate and distinct 
issues raised under the National Labor Relations Act." Id. at 
304.

 Consequently, the Board acted reasonably in concluding 
that the supervisors violated section 8(a)(1) despite the fact 
that a number of employees and Grayson residents might 
legally carry firearms in their vehicles or on their person.

 B.

 Ordinarily, a striking employee remains an "employee" 
under the Act, see 29 U.S.C. s 152(3) (1994), and may not 
generally be fired or refused reinstatement at the conclusion 
of the strike. See NLRB v. Fleetwood Trailer Co., 389 U.S. 
375, 378 (1967). However, employee discipline that neither 
coerces nor discriminates on account of activity protected by 
the Act does not implicate the Act. See NLRB v. Fansteel 
Metallurgical Corp., 306 U.S. 240, 254-57 (1939). Because 
serious misconduct by strikers is not protected by the Act, 
reasonable discipline, including the refusal to reinstate em-
ployees for such misconduct, does not constitute an unfair 


labor practice under sections 8(a)(1) or 8(a)(3) of the Act. See 
29 U.S.C. s 158(a)(1), (a)(3); NLRB v. Champ Corp., 933 
F.2d 688, 700 (9th Cir. 1990); Columbia Portland Cement Co. 
v. NLRB, 915 F.2d 253, 257 (6th Cir. 1990); Paramont 
Mining Corp. v. NLRB, 631 F.2d 346, 349 (4th Cir. 1980). 
One form of striker misconduct that the Board has concluded 
may justify discharge is vandalism to automobiles. See, e.g., 
General Indus. Employees Union, Local 42 v. NLRB, 951 
F.2d 1308, 1314 (D.C. Cir. 1991); Newport News, 738 F.2d at 
1410; Certainteed Corp., 282 N.L.R.B. 1101, 1118 (1987). 
Cook therefore could permissibly discharge the nine strikers 
for their attacks on replacement worker automobiles during 
the strike.

 But while serious strike-related misconduct may be pun-
ished under the Act, "if the company knew its employees 
were equally culpable of misconduct and chose to discipline 
only the strikers then an unfair labor practice charge would 
be founded." Garrett R.R. Car & Equip., Inc. v. NLRB, 683 
F.2d 731, 740 (3d Cir. 1982); accord Aztec Bus Lines, 289 
N.L.R.B. at 1027. The test is one of degree, and the court 
has recognized that the Board is well-suited to evaluate 
whether an employer knowingly tolerated misconduct by non-
strikers that was at least as "serious," see id. at 1027, as the 
misconduct committed by fired striking workers. Thus, "the 
Board may make reasonable judgments about the seriousness 
of various offenses--or more properly about an employer's 
explanation for treating some offenses more harshly than 
others." Gibson Greetings, Inc. v. NLRB, 53 F.3d 385, 393 
(D.C. Cir. 1995).

 The Board decided that the supervisors' "reason for han-
dling the rifle was unrelated to the pickets or the strike" and 
that, under the circumstances, the supervisors' action was not 
"the equivalent of displaying firearms to pickets while cross-
ing picket lines." Cook Family Foods, 323 N.L.R.B. No. 62, 
at 2. Explaining that the distance between the strikers and 
the supervisors was significant, the Board concluded that the 
gun was not being used to intimidate the strikers, but rather 
being examined for sale, and observed that the supervisors 


sighted the rifle away from the pickets.2 See id. Further-
more, the Board contrasted the intent of the supervisors with 
that of the discharged strikers. The "poor judgment" of the 
supervisors in displaying the rifle, in the Board's view, did not 
compare with the intentional harm to the automobiles by the 
strikers. Id.

 Despite the union's contention to the contrary, the Board's 
decision in Keco Industries does not require a different 
conclusion. In that decision, the Board found that because a 
striker with a gun in his waistband was "in the vicinity of the 
gate used by nonstrikers," which was "often a focal point for 
the venting of anger and frustration," making "[t]he inherent 
danger of a gun ... particularly acute," the employer could 
terminate the striker without committing an unfair labor 
practice. Keco Indus., 301 N.L.R.B. at 303. While Keco 
Industries indicated that the possession of a firearm could 
constitute grounds for termination during a strike, it does not 
suggest that workers with firearms must be terminated. Nor 
does it compare gun possession with intentional vandalism, 
such as that committed by the discharged strikers here. The 

__________
 2 The union seeks a remand of the case to an administrative law 
judge to determine whether the supervisors pointed the rifle at the 
picketers or away from them. The union maintains that the 
administrative law judge failed to resolve a credibility dispute 
between the supervisors, who claimed that they pointed the rifle 
away from the pickets, and the picketers, who disagreed. The 
administrative law judge found that the supervisors "sighted [the 
rifle] on a target to the northeast of their position," away from the 
picket line to the southwest and the trailer to the northwest of the 
supervisors. Cook Family Foods, 323 N.L.R.B. No. 62, at 7. More 
to the point, the union failed to raise the contention that a further 
finding was necessary while the case was before the Board. "No 
objection that has not been urged before the Board ... shall be 
considered by the court, unless the failure or neglect to urge such 
objection shall be excused because of extraordinary circumstances." 
29 U.S.C. s 160(e); see, e.g., Noel Foods v. NLRB, 82 F.3d 1113, 
1120-21 (D.C. Cir. 1996); NLRB v. L & B Cooling, Inc., 757 F.2d 
236, 240 (10th Cir. 1985); NLRB v. R.J. Smith Constr. Co., 545 F.2d 
187, 192 (D.C. Cir. 1976). The union has alleged no such extraordi-
nary circumstances.


Board addressed and distinguished Keco Industries, reason-
ably albeit briefly, based upon the distance of the supervisors 
from the picketers. See Cook Family Foods, 323 N.L.R.B. 
No. 62, at 2 n.4.

 Nor is the Board's conclusion inconsistent with its Gibson 
Greetings precedent. In that case, the Board adopted an 
administrative law judge's conclusion that a company's failure 
to discipline a nonstriking employee who "drove through the 
picket line, at least once, with a gun displayed on the dash-
board of her car" when it had terminated strikers who had 
damaged cars and assaulted workers, was discriminatory. 
Gibson Greetings, 310 N.L.R.B. at 1309, aff'd in relevant 
part, 53 F.3d 385, 393-94 (D.C. Cir. 1995). Gibson Greetings 
involved a confrontation at a picket line, where the Board has 
concluded that tensions are likely to be high. See id. at 1313; 
cf. Chesapeake Plywood, 294 N.L.R.B. at 203-04. The super-
visors sighted their hunting rifle 140 yards away from the 
picket line and did not point it at the picketers. See Cook 
Family Foods, 323 N.L.R.B. No. 62, at 2. As the Board 
explained, "unlike the individuals in Gibson Greetings ..., 
whose display of firearms while crossing the picket line 
clearly was intended to intimidate the pickets, [the supervi-
sors'] reason for handling the rifle was unrelated to the 
pickets or the strike." Id. The Board did not act inconsis-
tently by treating the supervisors differently than the armed 
nonstriker in Gibson Greetings.

 Because the Aztec Bus Lines calculus involves balancing 
types of strike misconduct and weighing of facts, the court 
properly defers to the Board where its factual findings are 
supported by substantial evidence, as they are here. See 
Gibson Greetings, 53 F.3d at 393. The Board's conclusion 
that Cook might legitimately decide that the supervisors' 
unintentional misconduct warranted less punishment than the 
intentional vandalism by the strikers was not unreasonable.

 Accordingly, we deny the petitions and order enforcement 
of the decision and order of the Board.