# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 28, 2013

Lyle W. Cayce
Clerk

No. 11-60877

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

ARKEMA, INCORPORATED,

Respondent.

Application for Enforcement of an Order
of the National Labor Relations Board

Before DAVIS, JONES, and SMITH, Circuit Judges.
JERRY E. SMITH, Circuit Judge.

The National Labor Relations Board ("NLRB" or "Board") applies for enforcement of its order upholding a decision of an administrative law judge ("ALJ") invalidating a decertification election based on findings that Arkema, Incorporated ("Arkema"), violated the National Labor Relations Act ("NLRA" or the "Act"), before an election, by disciplining an employee for alleged harassment and sending an anti-harassment policy to employees.  The Board also found

No. 11-60877

Arkema in violation because it ceased to recognize the union after the election but before an official certification of the results. Finally, the Board determined that Arkema's post-election actions against another employee violated the NLRA. After reviewing the record and consulting the applicable law, we deny the application for enforcement.

I.

Arkema operates a chemical-manufacturing plant in Houston, where the facts occurred. The production and maintenance employees were union employees represented by the United Steelworkers of America. The most recent collective-bargaining agreement governed thirty-five employees at the Houston facility and was set to expire on October 10, 2008. Beginning in April 2008, bargaining-unit employees began a campaign to decertify the union. A decertification petition was filed in July, and a secret-ballot decertification election was held on August 11 and 12. By a count of 18–17, the bargaining-unit employees voted to decertify.

A.

Mark Saltibus was a utility and step-up chief operator. His position required him to fill in for absent employees, including sometimes serving as the highest-ranking official at the plant. About July 2008, he approached Susan Russell, a relatively new employee, and engaged her in a conversation concerning the upcoming decertification election, informing her that the union needed her support and that without it, relationships would change at the plant.

Russell, who sometimes needed the assistance of physically strong male co-workers to perform certain aspects of her job, was upset by the exchange. Fearing for her safety and job, she promptly reported the incident to Terry Freeman, the plant's site manager. According to Russell's incident statement, Salti-

No. 11-60877

bus specifically threatened that male union employees would not come to Russell's aid in an emergency if she did not support the union in the election.

The following day, Saltibus was summoned to the management office to offer his version of the conversation to Freeman, regional human-resources manager Wendy Dupuy, and operations superintendent Dennis Van Wye. Saltibus admitted his intended message was that Russell would no longer receive help "carrying her load" from union employees. Saltibus insisted, however, that if Russell was in any kind of danger, he would assist her and that he made no mention of her sex in the conversation.

Freeman then handed Saltibus a "written reminder" for "Violation of Company Harassment Policy" stating that Arkema had "completed its investigation into [his] alleged inappropriate behavior." The violations alleged were "making intimidating and threatening remarks toward a coworker and creating an offensive working environment" and "threatening [Russell's] job if she continued to pursue her non-union status." The letter also made reference to a separate occasion on which Saltibus allegedly had "made threatening and inappropriate remarks to a laboratory employee concerning her wishes to not join the Union." The written warning concluded by advising Saltibus to reflect on the incidents and warned that failure to comply with Arkema's anti-harassment policy might result in termination.

### B.

On July 23, plant manager Wendal Turley sent an email to bargaining unit employees with two attachments—an NLRB publication about union elections and a memo drafted by Turley. The memo informed employees of their rights:

> • NO HARASSMENT— You have the right to not be harassed, intimidated or threatened in any way—physically or verbally—by

No. 11-60877

anyone, including the union, for refusing to support a strike or certification.
•   NO THREAT OF JOB LOSS— The union cannot threaten that you will lose your position by not supporting them in a vote.
•   NO PUNISHMENT— The union cannot seek suspension, discharge or other punishment of an employee for not being a member of the union, even if the employee has paid an initiation fee and ongoing dues.
•   NO REFUSAL TO GRIEVE— The union cannot refuse to process a grievance because an employee has criticized union officials or because an employee is not a member of the union.

The email urged employees to report any harassment, intimidation, or threats immediately to management or the NLRB's Houston office. Turley concluded with his personal opinion that a union was not needed at the Houston plant.

C.

At the conclusion of the election, Turley notified employees that "the collective bargaining agreement no longer exists at this facility." Management sent an email to employees approximately one week after the election, seeking input regarding changes to the employee leave and accident policies. By September, Arkema had removed the union's bulletin boards and ceased collecting union dues. In about October, the company unilaterally gave a wage increase.

D.

In the wake of the decertification election, on August 19, union group president and plant instrumentation and electrical "lead man" Fred Shepherd was summoned to a meeting with site manager Freeman and plant manager Turley. Freeman informed Shepherd that the purpose of the meeting was to investigate three complaints management had received concerning Shepherd: (1) that on July 26, he was allegedly "throwing things" around the shop; (2) that he had threatened an employee by stating that the employee was either with him or

4

No. 11-60877

against him; and (3) that on or about July 28, he had told an employee not to explain something to another employee, because that employee was non-union.

Shepherd denied the first two allegations and offered his version of the events surrounding the third. Before leaving the meeting, Turley and Freeman reminded Shepherd of the need for him, as a "lead man," to refrain from being confrontational or creating a hostile work environment. Shepherd left without any disciplinary action's being taken.

On September 4, Shepherd met with Freeman to discuss Arkema's recognition of the union, the union's use of plant bulletin boards, and the processing of union grievances. The following day, Shepherd sent Freeman an email to confirm their discussion. Later the same day, Freeman approached Shepherd, handed him an envelope containing a document entitled "Written Confirmation—Alleged Violation of Company Anti-Harassment Policy," and asked him to reflect on his responsibilities.

The letter described the three incidents that had been discussed with Shepherd and stated that Arkema had "completed its investigation into your alleged inappropriate behavior towards your coworkers." The letter noted the discrepancies in Shepherd's explanation and that the allegations remained uncorroborated. It warned that if Arkema received verified reports of future misconduct, it "could lead to further disciplinary action up to and including termination." The letter was put into Shepherd's personnel file.

II.

On August 19, the union filed an objection to the election and its initial charge of an unfair labor practice; it filed additional charges on August 29. The cases were consolidated.

The ALJ found that Arkema had violated Section 8(a)(1) of the NLRA by issuing the July 22 written warning to Saltibus and by sending the July 23

5

No. 11-60877

memo to unit employees. The ALJ further found that those pre-election violations had the effect of invalidating the decertification election, rendering Arkema's subsequent de-recognition of the union and unilateral actions likewise in violation of Section 8(a)(1) and (5). Finally, the ALJ found that Arkema had violated Section 8(a)(1) and (3) by disciplining Shepherd. The ALJ issued a cease-and-desist order directing Arkema to discontinue interference with union activities, to cease Arkema's unilateral actions, to resume recognition of the union, and to post remedial notices. The decertification election was to be set aside and a new election ordered.

Arkema appealed to the NLRB, which affirmed and adopted the ALJ's rulings, findings, and conclusions of law. The Board modified the ALJ's order by requiring that, in addition to physical posting of remedial notices, Arkema must post such notices electronically.

III.

We consider the factual findings of the NLRB to be "conclusive" if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656–57 (5th Cir. 2012). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *Id.* at 656 (quoting *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993)). "We may not reweigh the evidence, try the case de novo, or substitute our judgment for that of the Board, 'even if the evidence preponderates against the [Board's] decision.'" *Id.* (quoting *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). Nor do we displace any reasonable witness-credibility determinations made by the ALJ. *See Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 463–64 (5th Cir. 2001). Although we accord Board findings a measure of deference, our review is "more than a mere rubber stamp of the decision."

No. 11-60877

*Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996).  "Because the [c]ourt is not left merely to accept the Board's conclusions, the [c]ourt must be able to 'conscientiously conclude that the evidence supporting the Board's determination is substantial.'"[1]  We review the Board's legal conclusions *de novo*.  *El Paso Elec.*, 681 F.3d at 656.

## IV.

The NLRB adopted the ALJ's finding that by issuing the written reminder to Saltibus after his confrontation of Russell and by sending the anti-harassment email to employees, Arkema had violated NLRA Section 8(a)(1), which states that "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in [NLRA § 7]." 29 U.S.C. § 158(a)(1).  Section 7 grants employees "the right to self-organization, to form, join, or assist labor organizations."  *Id.* § 157.

### A.

An employer violates Section 8(a)(1) if it disciplines an employee because of his union activity.  *Valmont*, 244 F.3d at 463.  We look to the framework established in *NLRB v. Burnup & Sims, Inc.,* 379 U.S. 21, 23 (1964), to determine whether a Section 8(a)(1) violation occurred in this context.  "At all times, the burden of proving discrimination is that of the [NLRB] General Counsel." *NLRB v. Plastic Applicators, Inc.*, 369 F.2d 495, 498 (5th Cir. 1966).

The employer bears the initial burden to show that it had a good-faith belief that the employee was engaged in misconduct.  *Burnup & Sims*, 379 U.S. at 23 n.3.  The burden then shifts to the General Counsel, who must prove that the employee was engaged in a protected activity, the employer knew it was pro-

---

[1] *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003) (quoting *NLRB v. Mini-Togs, Inc.*, 980 F.2d 1027, 1032 (5th Cir. 1993)).

tected, the employer's actions were based on alleged misconduct occurring in the course of the protected activity, and the employee was not guilty of misconduct. *Id.* at 23.

We must defer to the Board's factual finding unless it is not supported by substantial evidence.[2] We first address the Board's finding that Arkema did not have an honest belief that misconduct had occurred.

The Board credited Salitbus's account of the incident—that although he asserted that "the relationship's going to change" and he would no longer "carry her load," his remarks were not directed at Russell's sex. Based on his statement, the Board determined that Arkema could not have a good-faith belief of misconduct, because "he did nothing that could conceivably be considered to have created an offensive working environment." *Arkema, Inc.*, 357 NLRB No. 103 (Oct. 31, 2011). The Board also found that Arkema's procedures were suspect: that Arkema rushed the process by preparing the written statement for Saltibus before meeting with him and including an event from nine months earlier without allowing Saltibus to discuss it.

Even without disturbing the ALJ's credibility determination, *Valmont*, 244 F.3d at 463, that Saltibus did not direct his confrontation at Russell's sex, there is not substantial evidence that Arkema lacked a good-faith belief that Saltibus had threatened Russell. Saltibus admitted that he told Russell "if the Union goes away, there's no support . . . the relationships going to change" and that he meant to convey that he would no longer help carry her load or help her with physical aspects of her job. After a careful review of the record, we conclude that the only reasonable inference that can be drawn from the evidence is stated succinctly by the dissenting memberas follows:

In light of the undisputed facts and sequence of events, [Arkema]

---

[2] *See Lord & Taylor v. NLRB*, 703 F.2d 163, 169 (5th Cir. 1983) ("We cannot say that a decision which ignores a portion of the record is supported by substantial evidence.").

No. 11-60877

plainly possessed an honest, good-faith belief that Saltibus, as Russell reported, threatened to retaliate against her because of her exercise of Section 7 rights by withholding assistance that could jeopardize both Russell's continued employment and her physical safety within the plant.

*Arkema*, 357 NLRB, at *8 (Member Hayes, dissenting).

The burden then shifts to the General Counsel to prove that Saltibus was engaged in protected activity; that Arkema was aware of it; that the alleged misconduct occurred in the course of it; and finally that Saltibus was not guilty of misconduct. *Burnup & Sims*, 379 U.S. at 23. Even assuming Arkema had an honest belief, the Board found that Saltibus did not commit any misconduct, because the written notice did not expressly mention sex-based harassment, and Saltibus denied directing his threats at Russell's sex. The Board further concluded that because the company had failed to allege that Saltibus's actions violated another of the specifically mentioned classes in the anti-harassment policy —such as race, color, or religion—Saltibus cannot be guilty of misconduct. Once the General Counsel shows that no misconduct occurred, the violation stands despite the employer's good faith. *Id.*

"We have held that 'flagrant conduct of an employee, even though occurring in the course of [protected] activity, may justify disciplinary action by the employer.'"[3] Even if the incident began as protected activity, Saltibus escalated the encounter, thus losing the protection of the Act.

Harassment and intimidation are not protected union activities; offensive, hostile language and threats are not protected even if under the guise of union activity.[4] "In the simplest terms, it is preposterous that employees are incapable

---

[3] *Allied Aviation Fueling of Dall. LP*, 490 F.3d at 379 (5th Cir. 2007) (quoting *Boaz Spinning Co. v. NLRB*, 395 F.2d 512, 514 (5th Cir. 1968)).

[4] *Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB*, 253 F.3d 19, 26 (D.C. Cir. (continued...)

9

No. 11-60877

of organizing a union or exercising their other statutory rights under the NLRA without resort to abusive or threatening language." *Id.* "[U]nion supporters are not at liberty to intimidate or coerce other employees. When employees resort to that kind of activity, they take a position outside the protection of the statute and accept the risk of discharge upon grounds aside from the exercise of the legal rights which the Act protects." *Paramont Min. Corp. v. NLRB*, 631 F.2d 346, 348 (4th Cir. 1980).

There is of course some grey area—the actions "must be so flagrant or egregious as to warrant the removal of the Act's protection,"[5] and "the Act allows employees to engage in persistent union solicitation even when it annoys or disturbs the employees who are being solicited." *Ryder Truck Rental Inc.*, 341 NLRB 761, 761 (2004), *enforced*, 401 F.3d 815 (7th Cir. 2005). The Board has found some threats of termination protected under the NLRA.[6] Those decisions, however, turned on the Board's finding that the speaker was not in a position to enforce the threats but that instead, the employees were merely debating "the pros and cons of union representation." *Liberty Nursing Homes*, 245 NLRB at 1202; *see also Tri-County Mfg.*, 335 NLRB at 219. "[T]he Act does not license employers to take adverse action against such employees for inconsequential and trivial forms of misconduct." *Liberty Nursing Homes*, 245 NLRB at 1202–03.

---

[4] (...continued)
2001); *see also Mobil Exploration & Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 238 (5th Cir. 1999) (citing *NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 837 (1984)) ("The fact that an activity is concerted . . . does not mean that an employee can engage in it with impunity. An employee may engage in concerted activity in such an abusive manner that he loses the protection of Section 7.").

[5] *Tri-County Mfg. & Assembly, Inc.*, 335 NLRB 210, 219 (2001), *enforced*, 76 F. App'x 1 (6th Cir. 2003) (quoting *Traverse City Osteopathic Hosp.*, 260 NLRB 1061 (1982), *enforced*, 711 F.2d 1059 (6th Cir. 1983)).

[6] *See, e.g., Tri-County Mfg.*, 335 NLRB at 219; *Liberty Nursing Homes, Inc.*, 245 NLRB 1194, 1202 (1979).

No. 11-60877

In *Contempora Fabrics, Inc. v. United Food & Commercial Workers Union*, 344 NLRB 851 (2005), a union employee, Lambert, had told a female employee that she "had better not vote no for this union." *Id.* at 852. She immediately reported the incident to management, stating that Lambert's comment made her feel "upset and afraid." *Id.* The Board found that the employer's subsequent discipline of Lambert was lawful, because the comment, as "an implicit warning that unpleasant consequences would flow from a 'no' vote," lost the Act's protection. *Id.*

Similarly, the Fourth Circuit in *Paramont*, 631 F.2d at 349, drew the line where the conduct "is intended to threaten or intimidate" rather than merely to persuade. There, the union employee had reached into another employee's car and touched the employee on the head, asking whether he was going to support the union. After the non-union employee refused to get involved, the union employee made vulgar remarks, although the extent of his threat was disputed. *Id.* at 347. Because the employee's actions were successfully designed to intimidate, the court found his activity unprotected, regardless of whether the employee was "engaged in concerted activity." *Id.* at 349–50. The court denied enforcement of the Section 8(a)(1) violation, holding that the company was justified in discharging the employee. *Id.* at 350.

Saltibus's conduct exceeded persuasion—he sought to threaten and intimidate Russell. His own testimony verifies that he intended to communicate to her that he would withdraw the help on which she depended to do her job. His statement also strongly implied that he was referring to union employees and not merely his own assistance.

Moreover, Saltibus's threat was eminently credible. Though he was adamant that he would be careful to withdraw help only in his capacity as operator and not as step-up chief, that does not change the important fact that he was in a position to enforce the threat. The undisputed testimony establishes that Rus-

No. 11-60877

sell needed assistance from others to perform physical aspects of her job; a threat to withdraw that assistance, gratuitous or not, would impair her ability to perform her job and could cause her to lose it.

Saltibus's threats do not fall under the protection of the Act and are subject to employer-discipline. In summary, there is not substantial evidence to support the Board's finding that Arekma violated Section 8(a)(1).

B.

The Board found that Arkema violated Section 8(a)(1) when Turley sent the email about the company's harassment policies to plant employees. Whether an employer's warning to employees violates Section 8(a)(1) is governed by *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 647 (2004). *See River's Bend Health & Rehab. Serv.*, 350 NLRB 184, 186–87 (2007). First, we determine whether the employer's warning explicitly restricts protected union activities. *Id.* at 186. If there is no explicit restriction, "the violation is dependent upon a showing of one of the following: (1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights." *Id.* It is undisputed that the email did not explicitly restrict protected conduct, so the relevant inquiry is whether it falls within one of the three enumerated *Lutheran Heritage* factual situations.

The Board relied primarily on the first prong to say that the email violated the NLRA, finding that employees would reasonably construe the language to prohibit protected activity. It must be reasonable for employees to interpret the email to prohibit Section 7 activities, however; it is not enough that it merely could possibly be read that way. *Lutheran Heritage*, 343 NLRB at 647. The Board determined it would be reasonable to construe the email as prohibiting "persistent union solicitation" because it banned "any" harassment; it invited

12

No. 11-60877

complaints if employees felt harassed; and it was disseminated in what the Board found was a context of unfair labor practices.

The text of the email however, cannot be reasonably read to prohibit protected union activity. First, we have already addressed that it was not sent in the context of unfair labor practices. Nor does the request that employees should alert management if they "feel" harassed transform a policy into prohibiting Section 7 activity; it is unclear what kind of objective requirement the Board would prefer for an employee to voice his concern.

Finally, despite the Board's fixation with the word "any," the prohibition of harassment "in any way" cannot be reasonably interpreted to include protected activity. Unions do not have broad protection to commit harassment—intimidation and coercion are not protected activities. *Paramont*, 631 F.2d at 348. This case is distinguishable from situations in which the warnings prohibited behavior more benign than harassment, such as encouraging employees to sign union cards.[7] As the board noted in *Lutheran Heritage*, 343 NLRB at 648, "[w]e see no justification for concluding that employees will interpret the rule unreasonably to prohibit conduct that does not rise to the level of harassment, or to presume that [Arkema] will unreasonably apply it in that manner." In fact, the Board has held, where there is evidence of actual harassment, "that an employer may lawfully assure employees that it will not allow them to be threatened by anyone and that it may ask them to report such threats." *River Bend*, 350 NLRB at 186.

Neither does the second prong of *Lutheran Heritage* offer an alternative

---

[7] *See, e.g., W.F. Hall Printing Co.*, 250 NLRB 803, 804 (1980). In addition, Turley's personal opinion—that a union was not necessary—is not sufficient to transform the communication into an NLRA violation. Turley "did not indicate that [Arkema] would refuse to deal with the Union or that it would refuse to give employees more than they received without union representation." *Park N Fly, Inc.*, 349 NLRB 132, 134 (2007).

No. 11-60877

path to find the email in violation.[8] The Board concluded that the email was in response to union activity, because it referenced union activity and was sent before the election. The policy however, applied to all employees, even if harassment by union employees was expressly included: "You have the right to not be harassed, intimidated, or threatened in any way—physically or verbally—by anyone, including the union." The warning went so far as to let employees know they could contact the NLRB if they felt harassed—presumably by anti-union employees—and included an NLRB pamphlet describing employee rights. Unlike the situation in *Ryder Truck*, the memo did not focus on reporting only those employees advocating for the union.[9] Though the email was distributed before the election, it followed on the heels of Saltibus's harassment, which we have already determined is not protected conduct. *See River Bend*, 350 NLRB at 187.

## C.

"Where unfair labor practices that violate section 8(a)(1) of the Act occur prior to an election, the Board has discretion to set aside the election on the basis of the employer's pre-election conduct." *Selkirk Metalbestos, N. Am., Eljer Mfg., Inc. v. NLRB*, 116 F.3d 782, 787 (5th Cir. 1997). The opposing party bears the burden to show "facts sufficient to invalidate the election." *NLRB v. Hood Furniture Mfg. Co.*, 941 F.2d 325, 328 (5th Cir. 1991). "Moreover, an election may be set aside only if the objectionable activity, when considered as a whole, either tended to or did influence the outcome of the election." *NLRB v. Claxton Mfg. Co.*, 613 F.2d 1364, 1366, *clarified*, 618 F.2d 396 (5th Cir. 1980).

---

[8] Reliance on the third prong is also futile; the General Counsel attempts to rest on an incident that occurred before the warning's existence to show it was applied differently to anti-union employees.

[9] *See Ryder Truck*, 341 NLRB at 761; *see also E. Maine Med. Ctr.*, 277 NLRB 1374, 1375 (1985) (finding a Section 8(a)(1) violation where an employer told employees to let management know if anyone pressures them into signing a union card).

14

No. 11-60877

To determine that the election should be set aside, the Board relied on its finding of Section 8(a)(1) violations in the Turley email and the Saltibus notice. Similarly to this court's finding in *Selkirk*, 116 F.3d at 787, the "reliance on these instances as support for ordering a new election was unreasonable because they did not constitute unfair labor practices in violation of section 8(a)(1) of the Act." Instead, we recognize the "strong presumption that ballots cast under specific NLRB procedural safeguards reflect the true desires of the employees," *Hood Furniture*, 941 F.2d at 328, and we deny enforcement of the order setting aside the election and requiring a new one.[10] *See Selkirk*, 116 F.3d at 787.

## V.

The Board held that Arkema violated Sections 8(a)(1) and (5) by withdrawing recognition of the union, making unilateral changes to employment terms, and engaging in direct dealing with employees before the decertification results had been certified. Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representativ[e] of [its] employees," 29 U.S.C. § 158(a)(5); it is violated if a company disregards the bargaining representative by acting unilaterally or dealing directly with employees,

---

[10] The General Counsel argues that the decision to set aside the decertification election is not a final order and thus is not reviewable. The Board suggests that we could review that order only if the union wins the rerun and Arkema then refuses to bargain. We acknowledge that our review of NLRB decisions is limited and that Board orders of certification for representation elections are generally not directly reviewable. *Boire v. Greyhound Corp.*, 376 U.S. 473, 476 (1964). "Such decisions, rather, are normally reviewable only where the dispute concerning the correctness of the certification eventuates in a finding by the Board that an unfair labor practice has been committed as, for example, where an employer refuses to bargain with a certified representative on the ground that the election was held in an inappropriate bargaining unit." *Id.* at 477. We review the Board's determination here, where the dispute over the election has resulted in a finding by the NLRB that unfair labor practices have been committed, and Arkema refuses to bargain with the Union relying on the results of the election. *See Selkirk*, 116 F.3d 782 (denying the enforcement of the Board's decision to set aside the decertification election after holding that the Board erred in finding Section 8(a)(1) violations).

15

No. 11-60877

*see El Paso Elec.*, 681 F.3d at 657. "Section 8(a)(1) violations are derivative of violations of § 8(a)(5). A violation of § 8(a)(1) occurs when an employer takes adverse action against specific employees in connection with terms and conditions of their employment that are subject to collective bargaining." *Id.* (citing 29 U.S.C. § 158(a)(1), (5)). The ALJ, relying on *W.A. Krueger*, 299 NLRB 914 (1990), found that even if Section 8(a)(1) was not violated before the election, Arkema nonetheless violated Section 8(a)(5) by proceeding, before the election results were certified, as though no union existed at its Houston facility.

We review the Board's conclusions of law *de novo*. *Strand Theatre of Shreveport Corp. v. NLRB*, 493 F.3d 515, 518 (5th Cir. 2007). An employer does not automatically violate the NLRA, but merely proceeds at its own risk, when engaging in unilateral activities before a decertification election's results are formally validated. *Dow Chem. Co. v. NLRB*, 660 F.2d 637, 654 (Former 5th Cir. Nov. 1981).[11] Because we find no grounds for invalidating the decertification election, Arkema's reliance on the election results before their formal validation did not violate Section 8(a)(5).[12]

## VI.

The Board found that Arkema's discipline of Shepherd violated Section

---

[11] The General Counsel urges that *Dow Chemical* is no longer good law, because it was decided when the standard for withdrawal of recognition was "good faith grounds for doubting the union's continued majority status." *Dow Chem.*, 660 F.2d at 657. The current standard requires "a showing that the union has, in fact, lost the support of the majority of the employees in the bargaining unit." *Levitz Furniture Co. of the Pac., Inc.*, 333 NLRB 717, 725 (2001). This change in standard however, does not suggest that this court's rule, allowing companies to rely on decertification elections at their own risk before certification, is no longer proper. A valid election would demonstrate an actual loss of majority support. We remain bound by this circuit's precedent.

[12] This circuit's rule, as laid out in *Dow Chemical*, 660 F.2d at 654, is contrary to the precedent relied on by the Board in *W.A. Krueger* and *Presbyterian Hospital*, 241 NLRB 996, 998 (1979), that an employer violates Section 8(a)(5) if it withdraws recognition after a decertification election but before the results are certified.

No. 11-60877

8(a)(1) and (3). Section 8(a)(3) prohibits discriminating in regard to the terms of an employee's hiring, tenure, or terms of employment on the basis of his membership in a union. 29 U.S.C. § 158(a)(3). Section "8(a)(3) allegations that turn on employer motivation are analyzed under *Wright Line*."[13]  To prove Section 8(a)(1) and (3) violations under *Wright Line*, the General Counsel must show, by a preponderance of the evidence, that the employee was engaging in protected activity, that the employer had knowledge of the activity,[14] that adverse action was taken against the employee, and that the activity was a motivating factor in the decision to discipline the employee. *United Rentals*, 350 NLRB at 951; *Bridgestone Firestone S.C.*, 350 NLRB 526, 529 (2007). If the General Counsel can make such a showing, the burden shifts to the employer to demonstrate that the action would have taken place regardless of any animus. *Bridgestone Firestone S.C.*, 350 NLRB at 529.

### A.

The parties contest the threshold matter of whether the August 19 meeting and September 5 letter were adverse employment actions. We do not disturb the Board's finding that the September 5 letter was a disciplinary action. There is substantial evidence to support that finding, given that warnings are considered part of the disciplinary process if they "lay 'a foundation for future disciplinary action.'" *Promedica Health Sys., Inc.*, 343 NLRB 1351, 1351 (2004) (quoting *Trover Clinic*, 280 NLRB 6, 16 (1986)). The letter was placed into Shepherd's personnel file and explicitly stated that verified future reports could lead to

---

[13] *United Rentals, Inc.*, 350 NLRB 951, 951 (2007) (citing *Wright Line*, 251 NLRB 1083 (1980)), *enforced on other grounds,* 662 F.2d 899 (1st Cir. 1981), *approved in NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983).

[14] It is undisputed that Shepherd was involved in protected union activity and that Arkema was aware of his role.

17

No. 11-60877

"further" disciplinary action. We do not need to consider whether the August 19 meeting with Shepherd was a disciplinary action.

B.

The fact that Arkema disciplined a union official is not the end of the inquiry. Under *Wright Line*, 251 NLRB at 1089, for an adverse employment action to violate the Act, the General Counsel is required to show, by a preponderance of the evidence, that anti-union animus was a motivating factor in the discipline. Requiring the General Counsel to carry the burden is important to avoid "immuniz[ing] union activists against legitimate discipline for genuine offenses, and [depriving] employers of the freedom to apply their own rules uniformly to all their employees." *Wright Line*, 662 F.2d at 902. As we now explain, there was not substantial evidence to support a finding either that Arkema demonstrated anti-union animus or that such animus was the motivating factor in providing Shepherd a written confirmation of the meeting.

1.

The ALJ found that Arkema's animus toward the union was established by the unfair labor practices—the Saltibus incident, the Turley email, and the de-recognition of the union before the election was certified. Next, the ALJ found that Arkema's actions against Shepherd were motivated by its anti-union bias "[b]ecause of the timing of the discipline, as well as the totality of circumstances surrounding [Arkema's] discipline of Shepherd." Concluding that the burden had been met, the ALJ found that Arkema had failed to prove that it would have taken the same action regardless of Shepherd's role with the union. Specifically, the ALJ found it curious that, although, after its August 19 meeting with Shepherd, management concluded no discipline was warranted, it nonetheless issued the September 5 disciplinary letter despite the fact that no further

18

investigation had been conducted. Considering all of this, the ALJ arrived at the "obvious conclusion . . . that the letter was a response to Shepherd's attempts to continue to represent the Union in the face of [Arkema's] eagerness to be done with the Union at the Houston plant."

2.

To establish animus, the ALJ primarily relied on the other findings of violation and the timing of the action against Shepherd. The Saltibus incident, the Turley email, and Arkema's rejection of the union after the election cannot establish animus, however, because they were not violations of the NLRA; nor is a general animus sufficient—the General Counsel must prove that animus was a motivating factor in the decision to provide Shepherd with a "written reminder." Substantial evidence to support a finding of animus-motivated discipline would have to rest solely on the timing of events: that management met with and issued a written confirmation to Shepherd in the midst of his campaign to overturn the decertification election and that the letter was issued roughly two weeks after the meeting.

Circumstantial evidence may be sufficient for a *prima facie* showing of animus-based motivation. *Valmont*, 244 F.3d at 465. Timing, among other factors, can provide evidence of a relationship between the adverse employment action and union activity. *Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 565 (5th Cir. 2003). Other factors considered when assessing motive include

> the presence of other unfair labor practices, the failure to investigate the conduct alleged as the basis for discipline, disparate treatment of the disciplined employee or discipline that deviates from the employer's past disciplinary practice, the implausibility of the employer's explanation of its action, inconsistencies between the employer's proffered reason for the discipline and other actions of that employer, and the seriousness of the alleged violation.

No. 11-60877

*Id.* (citing *Valmont*, 244 F.3d at 456). "Mere suspicions of unlawful motivation are insufficient to establish violations of the NLRA." *Asarco*, 86 F.3d at 1408 (internal quotations omitted).

First, a two-week gap between the employee meeting and the issuance of the confirmation letter, though perhaps evidence of corporate disorganization, is not substantial evidence of animus-based discipline. Delayed action can be suspect if the employer knew of the purported rationale for a substantial amount of time and then acted only "on the heels of heavy union activity."[15] Two weeks is hardly comparable to the decade-long delay in *Healthcare Employees*, 463 F.3d at 921, especially considering that the Houston plant was closed twice between the August 19 meeting and the delivery of the September 5 letter.

We are left to determine whether a note in the personnel file, coinciding with the employee's efforts to overturn the decertification, is substantial evidence to support a finding that, by a preponderance of the evidence, Arkema was motivated by anti-union animus in its discipline of Shepherd. The General Counsel relies on *Healthcare Employees*, in which the timing of the employer's decision to outsource a department two weeks before the representation election was found to be a "stunningly obvious" "inference of anti-union animus." *See Healthcare Employees*, 463 F.3d at 920 (quoting *NLRB v. Rubin*, 424 F.2d 748, 750 (2d Cir. 1970)). There the Ninth Circuit noted that "[c]ourts have consistently treated an employer's adverse employment action occurring between the filing of a petition for a representation election with the Board and the ensuing election as raising a powerful inference of anti-union animus." *Id.*

Significantly, the outsourcing in *Healthcare Employees* disenfranchised 25% of the employees eligible to vote—an overwhelming majority of whom were pro-union. *Id.* The timing in the instant case was not so suspect—the meeting

---

[15] *See Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1283 (D.C. Cir. 1999); *see also Healthcare Employees Union v. NLRB*, 463 F.3d 909, 921 (9th Cir. 2006).

and resulting confirmation letter did not come about between the filing of the decertification petition and the election, nor could they have affected the result of the election.[16]

The General Counsel also cites *NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418 (11th Cir. 1998). Similarly to *Healthcare Employees*, the company in *McClain* laid off nineteen of fifty employees nine days after a petition for certification was filed. *Id.* at 1423. In addition to suspect timing, the CEO had been overheard making hostile statements toward the union immediately before the layoffs: "I'm getting rid of the people in the shop. I'm going to show them who is boss around here. I'm going to show them who they're [f------ with]." *Id.*

Arkema does not come close to expressing the kind of anti-union hostility demonstrated in *McClain*. Again, the issuance of Shepherd's letter after the election, without more, does not rise to the same level as a mass layoff before an election.

This is not to say that timing cannot be sufficient evidence if it is not during the "critical period" before an election. In a case relied on by the ALJ, the court in *W.F. Bolin Co. v. NLRB*, 70 F.3d 863 (6th Cir. 1995), reviewed the situation of a subcontractor who hired union painters for a project, laid off the two painters who had been complaining about violations of their bargained-for rights, and then claimed the job no longer needed as many painters. The court found substantial evidence of animus-motivated layoffs, considering that the company "expressed hostility towards the painters' complaints regarding its compliance with the [collective bargaining agreement] . . . [the company] had knowledge of [the laid-off painters'] roles in voicing those complaints[;]" that the

---

[16] Two of the incidents that culminated in the August 19 meeting actually occurred at the end of July, during the "critical period" between the petition and the election. It is notable that Arkema waited until after the election, when there were three reported incidents, to conduct a formal meeting and issue a written confirmation.

painters "were treated differently from those employees who took a less active role in complaining," and that the company's hiring of another painter two weeks before the layoffs suggested the given reason of scaled-back needs was mere pretext. *Id.* at 871. After addressing all of those factors, the court noted the proximity in time between the layoffs and the painters' complaints. *Id.* at 872.

Though these other courts found other circumstantial evidence of animus-based action, the Board, the ALJ, and the General Counsel fail to suggest, nor can we find, any further circumstantial evidence of anti-union animus motivating Arkema's discipline of Shepherd. The record does not demonstrate, for example, that Arkema failed to investigate the claims, that its explanation was implausible, or that its treatment of Shepherd was inconsistent. *See Tellepsen*, 320 F.3d at 565. Although the presence of unfair labor practices can be a factor, *id.*, we have already rejected the Board's other findings of violations.

The timing alone—of the investigation's and issued letter's coinciding with Shepherd's union activities—is not substantial evidence that Arkema was motivated by anti-union animus. It would swallow the burden and the entire purpose of the *Wright Line* analysis, 662 F.2d at 902, if a meeting and disciplinary letter, without any further evidence of anti-union animus, could never occur simultaneously with union activity.

The application for enforcement is DENIED.[17]

---

[17] Because we deny enforcement of the Board's findings of violations, we do not need to address the modified remedial order involving electronic postings.