# United States Court of Appeals
### For the Eighth Circuit

_____

No. 24-1680
No. 24-1863

_____

Midwest Division-RMC, LLC, doing business as Research Medical Center

*Petitioner/Respondent*

v.

National Labor Relations Board

*Respondent/Petitioner*

National Nurses Organizing Committee-Missouri & Kansas/National Nurses United; Service Employees International Union HCII

*Intervenors*

_____

No. 24-1829

_____

Service Employees International Union HCII, Missouri/Kansas Division

*Petitioner*

v.

National Labor Relations Board

*Respondent*

_____

National Labor Relations Board
_____

Submitted: June 12, 2025
Filed: March 18, 2026
_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.
_____

LOKEN, Circuit Judge.

Midwest Division-RMC, LLC (Midwest) is an acute care hospital in Kansas City, Missouri. Since 2010, Midwest has had collective bargaining relationships with two unions, Service Employees International Union HCII, Missouri/Kansas Division (SEIU), and National Nurses Organizing Committee-Missouri & Kansas/National Nurses United (NNOC). In June 2021, members of the SEIU bargaining unit held a decertification election and voted to no longer be represented by SEIU. Midwest withdrew recognition and refused to process three member grievances, with SEIU's objections to the election results pending before the Board. Following an unrelated September 2021 grievance meeting, NNOC's labor representative complained that Midwest had wrongfully refused to let her participate in the meeting. This complex labor relations litigation encompassing both disputes ensued.

## I. Procedural History

SEIU and NNOC filed separate unfair labor practice charges with the National Labor Relations Board (NLRB or Board). The Board's General Counsel issued a Consolidated Complaint, alleging that Midwest violated Sections 8(a)(1) and (5) of

the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 158(a)(1) and (5),[1] when it stopped recognizing SEIU and refused to process the grievances, and when it did not allow NNOC's labor representative to attend the grievance meeting.

In May 2023, after an evidentiary hearing, an Administrative Law Judge (ALJ) issued a decision and recommended order determining that Midwest violated Sections 8(a)(1) and (5) when it withdrew recognition and failed to bargain with SEIU, and refused to meet with NNOC's designated union representative for a grievance meeting. In March 2024, a panel of three NLRB Members issued a Decision and Order that, as relevant here, affirmed the ALJ's conclusion that Midwest violated Sections 8(a)(1) and (5) when it withdrew recognition of SEIU and refused to process its grievances after the decertification election but before the election results were certified by the Board, and when it prevented the NNOC labor representative from attending the grievance meeting. The panel also added remedies requested by the General Counsel to the remedies recommended by the ALJ but declined SEIU's request for a "notice reading" remedy.

Midwest filed a petition for review with this court. The Board filed a petition for enforcement of its order. SEIU filed a petition with the Seventh Circuit for review of the Order declining its request for a notice reading remedy. The Judicial Panel on Multidistrict Litigation randomly selected this court in which to consolidate these petitions. After separate briefing and a consolidated oral argument, we grant the Board's petition for enforcement of its Order as it relates to NNOC; reverse the Board's Order as it relates to SEIU and remand with instructions to dismiss all

---

[1]Section 8(a)(1) proscribes unfair labor practices by an employer and states "[i]t shall be an unfair labor practice for an employer -- (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7] of this title[.]" Section 8(a)(5) provides that it is unlawful for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of [Section 9(a)] of this title."

portions of the General Counsel's Consolidated Complaint relating to SEIU; grant the Board's motion to enforce in part; and deny SEIU's petition for review.

As the disputes between Midwest and SEIU and Midwest and NNOC are factually unrelated, we will separately address them even though both resulted in the Board finding NLRA Section 8(a)(1) and (5) violations that are the primary focus of these consolidated appeals.

## II. Midwest's Decertification Dispute with SEIU

SEIU represents a unit of Midwest technical, service, and maintenance employees. Midwest and SEIU entered into a collective bargaining agreement (CBA) effective September 15, 2017, through May 31, 2020. On May 14, 2020, Midwest and SEIU began negotiating a successor CBA and during negotiations extended the 2017 CBA several times before allowing it to expire on February 28, 2021. Following expiration, Midwest stopped deducting union dues from employee paychecks and remitting them to SEIU. On March 29, an employee submitted a petition to the NLRB seeking an election to decertify SEIU as the unit's collective bargaining representative. See 29 U.S.C. § 159(e)(1). Two days later, on March 31, Midwest and SEIU reached a new two-year CBA, effective April 6. Midwest then resumed deducting and remitting dues to SEIU under the new CBA.

On June 14, a ballot count in the decertification election was held via video conference.[2] With 203 votes against SEIU, 171 for SEIU, and 13 challenged ballots,

[2]Under what is known as the contract-bar doctrine, employees generally may not *file* decertification petitions during the term of a CBA, for up to three years. But the March 31 CBA did not bar the election petition and subsequent election, as it was executed *after* an employee filed the decertification petition. See, e.g., Silvan Indus., 367 NLRB No. 28 (Oct. 26, 2018); Appalachian Shale Prods. Co., 121 NLRB 1160, 1161 (1958) ("[C]ontracts not signed before the filing of a petition cannot serve as a bar."). No party contends the decertification election was improperly held.

Midwest employees in the SEIU bargaining unit decided they no longer wanted SEIU to represent them. That day, Ashley McClellan, Midwest's Chief Executive Officer, emailed and posted a statement saying that employees had "raised their voice" and "chosen to remove SEIU as their representative, decertifying the SEIU here at [Midwest]." Midwest ceased recognition of SEIU, stopped deducting and remitting dues to SEIU, declined to bargain with SEIU over PRN wage rates, did not allow SEIU access to Midwest premises, and chose to not release employees for union-steward training -- actions contrary to the expired and the newly negotiated CBAs.

On June 21, SEIU filed objections to the conduct of the election with the Board's Regional Director. See 29 C.F.R. § 102.69(a)(8). When objections are timely filed, the Regional Director investigates the election and determines whether to order a re-run or to certify (make official) the results of the election. See § 102.69(c). On February 8, 2022, the Regional Director certified the results of the June 14 decertification election, overruling SEIU's objections to the election. This appeal concerns Midwest's non-recognition actions between the June 14, 2021 vote and the February 2022 Board certification of the employees' vote to remove SEIU as their representative, including Midwest's refusal to process grievances filed by bargaining unit members Frank Haney, Leilah Torres, and Kendyl Howard in September and October 2021because SEIU was no longer their exclusive bargaining representative and Howard and Haney's grievances were untimely under the CBA.

The Consolidated Complaint alleged that Midwest violated Section 8(a)(1) and (5) when it stopped recognizing SEIU after the June 14 vote tally but before the decertification vote was made official on February 8. Midwest was required to recognize SEIU until the vote was formally certified. Therefore, the actions it took after the election but before certification violated the NLRA.

The ALJ agreed. Relying principally on the Board's decision in W.A. Krueger Co., 325 NLRB 1225 (1990), the ALJ determined that Midwest violated Section

-5-

8(a)(1) and (5) by prematurely withdrawing recognition of SEIU and repudiating the parties' CBA prior to the formal certification of the decertification election results. Specifically, Midwest violated the Act by sending and posting an email that SEIU no longer represented Midwest employees; by failing to provide relevant information related to employee grievances;[3] by refusing to meet and confer over PRN pay; by ceasing to deduct and remit union dues; by denying SEIU access to Midwest's facility; and by refusing to release employees for steward training. On appeal, the Board "agreed with the [ALJ], for the reasons she stated, that [Midwest] engaged in a series of unlawful actions towards SEIU prior to Region 14's February 8, 2022 certification of the decertification election results." Its Order required Midwest to cease and desist from violating the NLRA; rescind its withdrawal of recognition of SEIU prior to February 8, 2022; give full force and effect to the CBA until February 8, 2022; furnish SEIU with requested information relating to the grievances; reimburse SEIU with interest for the dues not deducted and remitted during this period; and notify employees that SEIU continued to represent them until February 8, 2022. The Board rejected SEIU's request for a notice reading remedy.

In its petition for review, Midwest argues the Board erred in concluding that Midwest automatically violated the NLRA when it withdrew recognition of SEIU after the decertification vote tally but prior to certification of the election. Rather, the proper rule, applied by the Board in other cases, is that Midwest withdrew recognition of the union prior to certification *at its peril*. Therefore, when the Board subsequently overruled SEIU's objections and certified the election, Midwest had committed no unfair labor practice. This unresolved question has bedeviled Board members and reviewing courts for nearly half a century. We review this question of law *de novo*. See Starbucks Corp. v. NLRB, 140 F.4th 971, 975 (8th Cir. 2025); see also NLRB v. Arkema, Inc., 710 F.3d 308, 320 (5th Cir. 2013). We conclude the

_____

[3]Agreeing with Midwest, the ALJ found that Haney's grievance was untimely under the CBA.

Board's decision is unsupported by its own precedents and has "no basis in law or justice." Dow Chem. Co. v. NLRB, 660 F.2d 637, 654 (5th Cir. 1981).

The Board's decision in Krueger cannot be understood and analyzed without discussion of a case that preceded it, Mike O'Connor Chevrolet, 209 NLRB 701 (1974) (Mike O'Connor). There, the union petitioned for certification, and the parties agreed on the appropriate bargaining unit. The union won the election 8 to 6, but there were 3 challenged ballots, enough to affect the outcome. The union objected to the election and filed unfair labor practice (ULP) charges, some for Mike O'Connor's unilateral postelection changes in working conditions. Id. at 701-02. The ALJ sustained two challenges, enough to uphold the election, and recommended the union be certified but the 8(a)(5) charges be dismissed because "[a]n employer may await the results of an election before bargaining . . . particularly where, as here, he had not committed any other unfair labor practices." Id. at 711. In sustaining the General Counsel's objection to this recommendation, the Board explained:

> The Board has long held that, absent compelling economic considerations for doing so, an employer acts *at its peril* in making changes in terms and conditions of employment during the period that objections to an election are pending and the final determination has not yet been made. And *where the final determination on the objections results in the certification of a representative, the Board has held the employer to have violated Section 8(a)(5) and (1) for having made such unilateral changes*. . . . To hold otherwise would allow an employer to box the union in on future bargaining positions by implementing changes of policy and practice during the period when objections . . . are pending.

Id. at 703 (emphasis added).[4] The Board did not differentiate between initial and decertification elections.

In Krueger, however, a divided Board panel applied a different rule when a union *loses* a decertification election. There, after the Board conducted a decertification election at which employees voted against the union, the union objected to the conduct of the election. Before the Board certified the results of the election, the employer made unilateral changes to the terms of employment and stopped bargaining with the union. 325 NLRB at 1225. The Board did not apply its Mike O'Connor rule -- that the employer acted at its peril in withdrawing recognition -- in which case it would have found the employer's unilateral action did not violate Section 8(a)(1) or (5) because the union's election loss was certified. Rather, the Board held that the employer violated the NLRA when it withdrew recognition of the union after the decertification election but before the results were certified by the Board, stating it is "well established that election results are not final until the certification is issued." The Board declined to apply the Mike O'Connor rule:

> Mike O'Connor created a narrow 'act at your own peril' exception to this general rule in the initial certification context. . . . The status quo for such an employer is to act unilaterally. Thus, to the extent that an employer is free to act at its peril, the Mike O'Connor rule allows an employer to maintain the status quo until a certification issues."

Id. at 1226. In our view, the Board recently undermined, if not overruled Krueger in Johnson Controls, Inc., 368 NLRB No. 20 (July 3, 2019).

---

[4]We denied the Board's petition for enforcement because the parties' stipulation to the appropriate bargaining agreement was enforceable and the union was not entitled to be certified based on an allegation that one challenged ballot was cast by a supervisor. "[W]e [did] not reach the question of whether [Mike] O'Connor violated the Act by making unilateral wage changes after certification." NLRB v. Mike O'Connor Chevrolet-Buick-GMC Co., 512 F.2d 684, 688 (8th Cir. 1975).

In Johnson Controls, the employer, with negotiations for a successor CBA ongoing, was presented with a "union-disaffection petition" signed by 83 of the 160 bargaining unit members. The employer notified the union it was cancelling a scheduled bargaining session and would no longer recognize the union when the CBA expired on May 7, two weeks later. Id. at *3. On May 8, the employer withdrew recognition and announced changes to the terms and conditions of employment favorable to employees. The union filed ULP charges. Id. at *4.

In August, an employee filed a petition for decertification that was blocked by the union's ULP charges. Stating that the issue presented was whether the employer demonstrated the union had lost its majority status as of May 8, the Board held that a Board-conducted secret ballot election is the preferred means of resolving that question. Id. at *7. If an employer receives evidence that a union has lost majority support, then the employer may tell the union within 90 days of the CBA's expiration that it plans to stop recognizing the union when the CBA expires; if the union wishes to reestablish a majority, it must file an election petition within 45 days of the employer's anticipatory withdrawal of recognition when the CBA expires. Id. at *9. If the employer withdraws recognition but refrains from taking unilateral action pre-election, "the union *loses* the election and . . . files election objections . . . the employer would make unilateral changes after the election *at its peril*." Id. at *11 (emphasis added). If the union's challenges "were to change the outcome of the election and result in a union victory, the union's representative status would be established as of the date of the election, and the employer's unilateral changes made after that date would violate Section 8(a)(5)." Id. at *11 (emphasis added). In other words, the employer acts at its peril in making unilateral postelection changes in this context, which is the situation on appeal in this case.

If the Board did not overrule Krueger in Johnson Controls, contrary to our reading of that decision, it at the very least undermined the rationale behind the Krueger rule. The Board in Krueger declined to follow Mike O'Connor in the

decertification context so as not to disturb the status quo. In the initial certification context, the NLRA status quo is not bargaining because there is no certified union. In the decertification context, the status quo is bargaining until the CBA expires and the NLRA-mandated subsequent period. In Johnson Controls, the Board held that, "[a]ssuming *the employer refrains from making changes*" -- that is, continues to recognize the union until the decertification election -- then the employer *acts at its peril* when making unilateral changes following the union's election loss. 368 NLRB at *11 (emphasis added). The status quo was bargaining, yet the Board allowed the employer to withdraw recognition after the election at its peril. That is not the "well established" Krueger rule the Board urges in this case.

The Fifth Circuit is the only other circuit to grapple with the Board's decisions in Mike O'Connor and Krueger.[5] In Arkema, 710 F.3d 308, bargaining unit employees began a campaign to decertify the union in April and filed a decertification petition in July. A secret-ballot decertification election was held in August, and the employees voted to decertify 18-17. Arkema notified employees "the [CBA] no longer exists" and ceased collecting union dues. Id. at 312-13. The union filed an objection and ULP charges. Relying on Krueger, the Board ruled that Arkema's pre-election ULPs invalidated the decertification election, rendering its subsequent de-

---

[5]Heartland Hum. Servs. v. NLRB, 746 F.3d 802 (7th Cir. 2014), on which the Board heavily relies, is distinguishable. There, the employer withdrew recognition after the union lost the decertification vote tally. The union objected. The Board ordered a new election based on the employer's objectionable conduct and petitioned to enforce its order that the employer committed a ULP by refusing to recognize the union after the first election. The court enforced the order, concluding it lacked jurisdiction to review the ordering of a new election and therefore the employer must continue to recognize the still-certified union before the new election was held. Id. at 805-07. Here, by contrast, the Board overruled SEIU's objections, certified the election results, and *did not order a new election*. Thus, Midwest acted at its peril by withdrawing recognition before the Board certified the election results.

recognition and unilateral actions in violation of Section 8(a)(1) and (5). Reviewing *de novo*, the Fifth Circuit denied the Board's petition to enforce the order:

> An employer does not automatically violate the NLRA, but merely proceeds at its own risk, when engaging in unilateral activities before a decertification election's results are formally validated. Dow Chem. Co. v. NLRB, 660 F.2d 637, 654 (5th Cir. 1981). Because we find no grounds for invalidating the decertification election, Arkema's reliance on the election results before their formal validation did not violate Section 8(a)(5).

Id. at 320. "A valid election," the court added, "would demonstrate an actual loss of majority support" noting that "[t]his circuit's rule, as laid out in Dow Chemical . . . is contrary to . . . Krueger and Presbyterian Hospital, 142 NLRB 996, 998 (1979)." Id. at 320 nn.11, 12.

In Dow Chemical, bargaining unit members of two unions filed petitions to decertify, the unions lost both Board-scheduled elections, Dow then unilaterally transferred employees to salaried status, and ULP charges were filed. Both ALJs held that Dow was free to place the employees on salaried status and grant wages but did so at its own risk while the union's election objections were pending, a rule having its origin in Mike O'Connor. Dow Chem., 660 F.2d at 641, 653. The Board, relying on Presbyterian Hospital, held that the union "remains the employees' bargaining representative until . . . the final election results have been validated by the board." Id. Therefore, Dow's post-election conduct violated Section 8(a)(1) and (5). The Fifth Circuit denied enforcement of both orders and explained in detail its reasons for rejecting the Krueger/Presbyterian Hospital rule:

> Though Mike O'Connor involved an initial representation election won by the union, and the present case involves a decertification election lost by the union, *we see no basis in law or justice for distinguishing between types of election or for distinguishing*

-11-

*on a basis of which side won or lost.* Moreover, we view the [NLRA] as requiring that its labor peace goals, as well as protection of workers' freedom to choose, be achieved by an even-handed application of the same rules of the game to all elections and to both sides. . . .

Mike O'Connor's requirement that an employer whose election objections are overruled must bargain retroactively about all post-election changes, thus restoring the duty-to-bargain status quo as of the date of the election, is fully applicable to the present circumstances. It is clear that a long-established union should not be destroyed immediately upon its loss of a decertification election, but Mike O'Connor causes no such result. The union continues to exist and, if its election objections are sustained, the employer must bargain retroactively with it. Further, the employees may elect at an appropriate time to return to the union. If, on the other hand, a union's objections are rejected and it has thus lost a fair election, no reason appears for requiring an employer to bargain with it . . . .

Similarly, the board disregards the "heads I win, tails you lose" aspect of its insistence that the no-duty-to-bargain status quo must be changed immediately when a union wins a representation election, as required by Mike O'Connor, and that the duty-to-bargain status quo must not be changed when a union loses a decertification election. . . . Rules should not be designed on an assumption that either employers or unions are or are not likely to employ them unfairly. Nor, as above indicated, should the rule applied be dependent on which side wins.

660 F.2d at 654-57 (emphasis added).

We agree with this analysis. We see no basis in the NLRA to distinguish between initial certification and decertification elections. In an initial certification election, the employees' choice to be represented attaches with the vote tally; if the employer does not recognize the union and the election is upheld by the Board, the employer must retroactively bargain with the union. But in the decertification context, Krueger *ignores* the employees' choice until the election results are certified.

-12-

Treating employee choice differently based on whether the union won or lost has no basis in the NLRA. "By its plain terms . . . the NLRA confers rights only on *employees*, not on unions or their nonemployee organizers." Lechmere, Inc. v. NLRB, 502 U.S. 527, 532 (1992) (emphasis in original).

We therefore reverse the Board's conclusion that Midwest automatically violated Section 8(a)(1) and (5) when it withdrew recognition of SEIU following the decertification vote. Midwest acted at its peril in ceasing to bargain with SEIU before the election results were certified. Because the Board overruled SEIU's objections to the election and certified the decertification election results, none of the actions Midwest took as a result of its decision to withdraw recognition of SEIU violated the NLRA. We decline to enforce the Board's order holding that Midwest violated Section 8(a)(1) and (5) by sending and posting an email that SEIU had been decertified; failing to provide relevant information; refusing to meet and confer over PRN pay; ceasing to deduct and remit union dues; denying SEIU access to Midwest's facility; and refusing to release employees for steward training. Because we conclude Midwest properly withdrew recognition of SEIU, we likewise reject SEIU's request to order a notice reading remedy.

### III. Midwest's Grievance Dispute with NNOC

NNOC represents a unit of full-time, part-time, and per diem Registered Nurses at Midwest. At all relevant times, Midwest and NNOC were parties to a CBA, which contained a multi-step grievance process for bargaining unit members. Relevant provisions include (emphasis added):

**SECTION 1. DEFINITIONS**

B. Grievant: A unit member, a group of unit members, or the Union.

**SECTION 2. GENERAL PROCEDURES**

-13-

G. The purpose of the grievance meeting is to engage in a good faith effort to resolve the dispute. At each step in the process, it is expected that individuals with authority to make agreements will participate in the meetings and will seek to come to a satisfactory resolution.

## SECTION 3. STEP ONE

Within twenty-one (21) calendar days of the . . . occurrence giving rise to the grievance, the authorized Union Representative shall file the written grievance with the Manager of the Nursing Unit to which the grievant is regularly assigned.

*The grievant and/or the authorized Union Representative and the Hospital may meet to discuss resolution of any grievance* at a mutually agreed upon time and date . . . . The Grievant will be represented by the Union Representative. The Hospital will be represented by the appropriate Hospital representative(s) which will typically be the Manager or Director of the Nursing Unit to which the Grievant is regularly assigned (or his/her designee). The Hospital shall respond, in writing to the Union within twenty-one (21) calendar days of its receipt of the grievance.

On August 16, 2021, authorized nurse representative Lisa Broeker[6] filed a grievance on behalf of RN Destinee Arthur over the placement of medical/surgical patients on the Women's Services Unit, which specializes in labor and delivery. As Broeker explained, this resulted in Women's Services Unit nurses "being assigned to care for patients that [they] didn't have knowledge to safely care for." She listed "Women's Services RN's/NNOC" as the group grievant and herself as the "Labor Representative/Women's Services Representative." NNOC Labor Representative Lisa Perry signed the form as "Grievant or Labor Representative."

---

[6]An authorized nurse representative, a position within NNOC, files grievances and accompanies nurse grievants to disciplinary or investigative meetings.

After filing the grievance, Broeker emailed Celeste Clelland, Director of the Women's Services Unit, to schedule a Step 1 meeting. In response to Clelland's request, Broeker said that she would attend as union representative along with Grievant Arthur and Chief Nurse Representative Cheryl Rodarmel. At the September 17 Step 1 meeting, Clelland, HR Business Partner Weston Smith, and Director of Labor and Employee Relations Kevin Meyers attended on behalf of Midwest. Smith advised Broeker and Arthur that Rodarmel would be excluded because Midwest interpreted the CBA as allowing only the grievant and one union representative to attend Step 1 meetings.

When Broeker and Arthur arrived, Broeker advised that Rodarmel could not attend but labor representative Perry, who offered to participate by telephone, would attend remotely. Midwest stated that Perry would not be allowed to participate and suggested Broeker postpone the meeting. Broeker argued Perry could attend as a grievant, speaking on NNOC's behalf as a witness to the bargaining history of the dispute. Midwest refused, and the meeting proceeded without Perry. Following the meeting, Perry emailed Meyers that "[y]ou are in violation of the grievance article by not allowing me to be present . . . I am a direct witness to this bargaining history." Meyers responded that Section 3 provided that only one union representative could be present. On October 8, Perry filed a grievance on this issue and then a ULP charge with the Board. The Consolidated Complaint alleged Midwest violated Section 8(a)(1) and (5) when it did not allow Perry to attend the grievance meeting.

The ALJ recommended that Midwest violated Section 8(a)(1) and (5) when it refused to allow Perry to attend the Step 1 grievance meeting because the Board has "consistently held that the Union has the right to select its own representatives," and nothing in the CBA limits NNOC to one representative in grievance meetings. The

-15-

Board agreed.[7]  Its Order required Midwest to notify NNOC that it would not refuse to meet and bargain with NNOC's designated representatives for processing grievances and, on request, meet and bargain with NNOC's designated representatives.  The NLRB petitioned for the enforcement of this Order; Midwest petitioned for review.  See 29 U.S.C. § 160(e)-(f).

In petitioning for review, Midwest argues it did "not violate the Act by refusing to allow Julie Perry to attend a grievance meeting," as the CBA only allowed one NNOC representative to attend.  The NLRB and intervenor NNOC respond that substantial evidence supports the Board's finding that Midwest violated the Act by refusing to meet and bargain with NNOC's designated representatives.  "We accept the Board's factual determinations if they are 'supported by substantial evidence on the record considered as a whole.'"  Starbucks Corp., 140 F.4th at 975, quoting 29 U.S.C. § 160(e)-(f).  We review *de novo* the Board's interpretation of the CBA.  Cedar Valley Corp. v. NLRB, 977 F.2d 1211, 1215 (8th Cir. 1992).  We conclude that the CBA is, at the very least, silent on how many union representatives could be present at the grievance meeting, and therefore enforce the Board's order with respect to NNOC.

Section 7 of the NLRA allows employees, acting though their union, to "freely [] select their representatives for the processing of grievances and discussion of workplace matters," absent waiver of those statutory rights.  Mo. Portland Cement Co., 284 NLRB 432, 433 (1987).  We find nothing in the CBA clearly limiting how many union representatives could be present at the NNOC grievance meeting.  Section 3 of the CBA provides that "the grievant and/or the authorized Union Representative and the Hospital may meet to discuss resolution of any grievance."

_____

[7]The Board did not err in choosing not to defer to arbitration this charge of an alleged interference with a basic statutory right of employees.  See Native Textiles, 246 NLRB 228, 229 (1979); 29 U.S.C. § 160(a).

There is no language expressly limiting the grievant to *one* representative. Indeed, the CBA states that at "each step in the process, it is expected that individuals with authority to make agreements will participate in the meetings and will seek to come to a satisfactory resolution." The CBA did not prohibit, and arguably encouraged, Perry to attend with Broeker as union representatives.

This dispute is more factual than legal. Assuming the CBA only allowed the grievant *and* one representative to attend, this was a group grievance, and the record evidence suggests that NNOC could have complied with this fictional requirement, even if Perry and Broeker both attended the grievance meeting. The CBA plainly allows multiple grievants to be present in this situation. The grievance form was signed by Perry as an authorized union representative. Broeker was listed as the authorized union representative to be present, but she was also a Women's Services RN, so she could have attended as a grievant witness alongside Arthur, allowing Perry to attend, or at least participate, as the authorized union representative. Thus, the record reasonably supports Broeker's argument to Midwest that Perry should be allowed to participate, at least as a witness for the group. Nothing in the CBA suggests that the parties cannot change the union representative at any point in the grievance process.

We therefore grant the Board's petition for enforcement of its Order as it relates to NNOC. We decline the Board's petition for enforcement of its Order as it relates to SEIU, set aside that portion of the Order and remand the case to the Board with instructions to dismiss all portions of the General Counsel's Consolidated Complaint relating to SEIU. We deny SEIU's separate petition for review.

_____